120 N.J. Super. 286 (1972)
293 A.2d 720
JOHN F. INGANAMORT, MICHAEL J. INGANAMORT, LA SALLE CONTRACTING CORP., A JOINT VENTURE TRADING AS MEDITERRANEAN TOWERS, ALEXANDER SUMMER, TRUSTEE UNDER LINWOOD BUILDINGS NO. 1 THROUGH 13, ROBERT SLATER AND BRUCE SLATER, A PARTNERSHIP TRADING AS SLATER ASSOCIATES, HARRY B. HELMSLEY AND ALVIN SCHWARTZ, GENERAL PARTNERS OF A LIMITED PARTNERSHIP TRADING AS HORIZON HOUSE ASSOCIATES, AND FORT LEE TAXPAYERS AND PROPERTY OWNERS COMMITTEE, PLAINTIFFS,
v.
BOROUGH OF FORT LEE, MAYOR OF BOROUGH OF FORT LEE AND COUNCIL OF BOROUGH OF FORT LEE, DEFENDANTS. FORT LEE HOMEOWNERS ASSOCIATION OPPOSED TO RENT CONTROL, PLAINTIFFS,
v.
BOROUGH OF FORT LEE, MAYOR OF BOROUGH OF FORT LEE AND COUNCIL OF BOROUGH OF FORT LEE, DEFENDANTS. CONTINENTAL GARDENS, INC., A NEW JERSEY CORPORATION, NANSEN RIVER EDGE, INC., A NEW JERSEY CORPORATION, AND VAN BUREN, INC., A NEW JERSEY CORPORATION, PLAINTIFFS,
v.
MAYOR AND COUNCIL OF THE BOROUGH OF RIVER EDGE AND THE BOROUGH OF RIVER EDGE, A MUNICIPAL CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided June 26, 1972.
*292 Mr. Clive S. Cummis, for plaintiffs John F. Inganamort, et al. (Messrs. Sills, Beck, Cummis, Radin & Tischman, attorneys; Mr. Richard Newman and Mr. Jay L. Hundertmark on the brief).
Mr. Patrick J. Tansey, for plaintiff Fort Lee Homeowners Association Opposed to Rent Control.
Mr. Sheppard A. Guryan, for plaintiffs Continental Gardens, Inc. et al. (Messrs. Lasser, Lasser, Sarokin and Hochman, attorneys).
Mr. William V. Breslin, for defendants Borough of Fort Lee, et al. (Messrs. Breslin & Monaghan, attorneys).
Mr. Ned J. Parsekian, for defendants Mayor and Council of Borough of River Edge et al. (Messrs. Parsekian & Ferro, attorneys).
PASHMAN, A.J.S.C.
Two complaints have been filed challenging the constitutionality of the defendant municipalities' recently adopted ordinances which seek to establish rent leveling systems designed to curtail the popularly labeled practice of "rent gouging" (the exacting of exorbitant rents through excessive rent increases).
Essentially, River Edge and Fort Lee, in response to public despair over the dwindling housing supply and the attendant sky-rocketing of rents, endeavored to fix rentals as of specified dates and provide for adjusted increases thereafter. Such changes would reflect cost-of-living increases, maintenance costs, capital improvement costs, property tax increases and general "hardship" factors. Administrative boards, designed to review and oversee the operation of the leveling provisions are also established. Further, the ordinances prescribe sanctions in the form of fines and imprisonment for the willful violation of their provisions. See N.J.S.A. 40:49-5.
*293 The plaintiffs are multiple-dwelling owners and a home-owners association opposed to rent control. This court imposed temporary restraints against the enforcement of the Fort Lee and River Edge ordinances pending formal argument. The New Jersey Tenants Organization was granted leave to file an amicus curiae brief. The issues to be adjudicated are legal in nature. Accordingly, the matter may be disposed of in a summary manner. R. 4:67.
The plaintiffs challenge the validity of the ordinances on the grounds that:
(1) There were two procedural defects concerning the adoption of the Fort Lee ordinance: (a) a five-minute time limitation during which opponents and supporters thereof were permitted to voice their viewpoints at the public meeting, and (b) the failure to publicly advertise and hold a public meeting on an amendment to the ordinance;
(2) The Fort Lee ordinance is arbitrary and oppressive and violates due process in that it may result in the imposition of severe and unwarranted tax increases on residential property owners;
(3) Due process and other statutory and constitutional objections to the various sections of the ordinances relating to summary dispossess measures render the ordinances unconstitutional;
(4) Due process and other statutory and constitutional objections to the various sections of the ordinances relating to tax surcharges render the ordinances unconstitutional;
(5) Due process and other statutory and constitutional objections to the various sections of the ordinances relating to delegation of powers to the administrative boards render the ordinances unconstitutional;
(6) The enactments are preempted by state legislation designed to occupy entirely the field of rent regulation; in this regard, they cite state statutes dealing with substandard housing and summary dispossess proceedings;
(7) The enactments are preempted by federal legislation designed to occupy entirely the field of rent regulation; in *294 this regard, they cite federal statutes dealing with the current federal economic program popularly referred to as Phase II;
(8) Municipalities generally lack the power and authority to regulate rents and landlord-tenant relationships; reliance is placed primarily on the case of Wagner v. Mayor and Municipal Council of Newark, 24 N.J. 467 (1957).

I

PROCEDURAL DEFECTS CONCERNING ADOPTION OF FORT LEE ORDINANCE
Two violations of the procedural provisions of N.J.S.A. 40:49-2 are alleged in relation to the adoption of the Fort Lee ordinance. The first is grounded on a five-minute limitation imposed on each speaker at the public meeting. N.J.S.A. 40:49-2, which governs the procedure to be employed in the enactment of municipal law, is silent with respect to the time to be allowed supporters or opponents of the ordinances. It merely mandates that the ordinance be subject to public expression at a public meeting. N.J.S.A. 40:49-2(b).
The public hearing in this case took place on January 19, 1972. There was considerable controversy surrounding the ordinance and the meeting was heated and well-attended. It lasted well into the night. Each speaker was afforded five minutes initially and an additional five minutes after all speakers were heard. The statute imposes no bar to such a procedure. There seems to be nothing patently unreasonable with such limitations. No speaker is alleging discrimination or unwarranted exceptions to the five-minute rule.
For the foregoing reasons, and in light of the presumption of reasonableness normally accorded municipal actions, it must be concluded that the ordinance is not voidable because of the time limitation imposed on speakers at the *295 public meeting. Ward v. Montgomery Tp., 28 N.J. 529, 539 (1959); Johnson v. Montville Tp., 109 N.J. Super. 511, 519 (App. Div. 1970).
The second procedural infirmity posed by plaintiffs relates to an amendment to the Fort Lee ordinance subsequent to its adoption but prior to its final passage. The ordinance as originally adopted was to be effective for a period of three years. Two weeks after its initial adoption by the governing body and the public hearing thereon, by an amendment, the effective period was reduced to one year. The said amendment further provided for extensions of the effective date from year to year by resolution of the governing body. At that same meeting, the ordinance was finally adopted.
Plaintiffs contend that the ordinance as finally passed is invalid since the notice and hearing requirements of N.J.S.A. 40:49-2(c) were not followed. That statute provides:
If any amendment be adopted, substantially altering the substance of the ordinance, the ordinance as so amended shall not be finally adopted until at least 1 week thereafter, and the ordinance as amended shall be read at a meeting of the governing body, which reading may be by title, and shall be published, together with a notice of the introduction, and the time and place when and where the amended ordinance will be further considered for final passage, at least 2 days prior to the time so fixed. [emphasis added]
The aforementioned procedure is mandated only where the adopted amendment "substantially" alters the substance of the ordinance. Wollen v. Fort Lee, 27 N.J. 408, 420 (1958).
Insofar as opponents to the ordinance are concerned, the term of the law was reduced and any prejudice that might result from the amendment would arise only after the third year of its effectiveness but certainly not until after the first year. At times, an extension could be achieved by resolution (without requirement of advertising and formal public hearing) rather than by compliance with the provisions of N.J.S.A. 40:49-2(c). Thus, it is only after the third year that the plaintiffs would be prejudiced, if at all. Prior to that time, *296 and even after, the ordinance will continue under the scrutiny of the public by virtue of the Right to Know Law. N.J.S.A. 10:4-1 et seq.
The problem requiring the exercise of the police power is the threat to the public welfare caused by a shortage of housing at reasonable rentals. The circumstances are emergent, as cited in the preamble to the ordinance. This difficulty is hopefully temporary. Even if the governing body had appended no time limitation to the ordinance, the effectiveness of this type of legislation is only for the emergency.
In weighing the equities in terms of the harm to the plaintiffs, the purposes for which N.J.S.A. 40:49-2(c) was enacted and the effect of the amendment on the substantive application of the ordinance, it is my conclusion that the amendment in question does not constitute such a substantial alteration to the ordinance as to warrant its invalidation. If anything, plaintiffs are benefited by the change. Under these circumstances, the decreased time period cannot be deemed to be a substantive aspect of the ordinance. Accordingly, no substantial alteration of the substance of the ordinance has occurred. Wollen v. Fort Lee, supra at 420; cf., Reisdorf v. Mountainside, 114 N.J. Super. 562, 574, 575 (Law Div. 1971).

II

CONSTITUTIONAL OBJECTS  TAX INCREASES ON RESIDENTIAL PROPERTY OWNERS
The Fort Lee homeowners group seeks to bottom a due process attack on the possibility that residential homeowners will incur substantial and unwarranted tax increases as a result of rent leveling. The argument is that property taxes on apartment houses will remain stable since the income derived therefrom will not increase. While the assessed value of the property remains constant, it is asserted that the cost of municipal services will increase. The difference, it is argued, *297 will fall exclusively on the shoulders of the residential property owners.
The plaintiffs' logic breaks down under an examination of the ordinance itself. Section 5 specifically provides for a tax surcharge to be passed on to the tenant "because of an increase in municipal taxes." In addition, the ordinance requires that tenants pay:
(1) differences in rentals (at lease renewal periods) as reflected by percentage increases between consumer price indices at commencement and termination of leases (section 2);
(2) hardship rental increases connected to mortgage payments (section 10);
(3) additional rental for capital improvements (section 10);
(4) additional rental for increased or more costly services (section 10).
Moreover, new housing units are exempted from the requirements of the ordinances; the landlord fixes the initial rent.
It is apparent, therefore, that under the ordinances, apartment dwellers are not to be preferred with respect to taxes or increased costs of municipal services. Nor will the apartment owners be deprived of recovering increased costs of improvements and daily services available and required in the dwelling. The veiled warning of disaster about to befall homeowners by reason of rent leveling is groundless.
If the foregoing were not enough to dispel the challenge raised by the association, it should suffice to repeat the proposition that legislative enactments are not necessarily defective because they may result in an incidental burden upon certain members of the community. Where the general welfare is served, the ordinance is presumptively valid. Garden State Racing Ass'n v. Cherry Hill Tp., 42 N.J. 454, 464 (1964); Zampieri v. River Vale Tp., 29 N.J. 599, 606 (1959); Kozesnik v. Montgomery Tp., 24 N.J. 154, 167 (1957); Johnson v. Montville Tp., supra. And the wisdom of the exercise of the legislative function in the *298 selection of the means to promote the general welfare is not open to arbitrary interference or review by the judiciary. New Jersey Mortgage Finance Agency v. McCrane, 56 N.J. 414, 422 (1970); Roe v. Kervick, 42 N.J. 191, 230 (1964); Guill v. Mayor, etc., Hoboken, 21 N.J. 574, 581-582 (1956); Fred v. Mayor, etc., Old Tappan, 10 N.J. 515 (1952).
For the foregoing reasons, if it is found that the ordinance under review is validly within the scope of municipal police power, the homeowners association charge cannot prevail.

III

CONSTITUTIONAL OBJECTIONS  SUMMARY DISPOSSESS MEASURES
Section 1(e) of the Fort Lee ordinance is the subject of attack by plaintiffs. It consists of definitions of terms presumably employed in the ordinance. It defines "just cause" as:
[A]ction on the part of the landlord in refusing to let, relet, or rerent to a tenant or basis for dispossess for any one or more of the following:
1. Failure on the part of the tenant to pay rent due and owing under the lease when the same be oral or written.
2. Disorderly or disturbing noises or conduct on the part of the tenant that destroys the peace and tranquility of the landlord, other tenants, or other persons living in or about the neighborhood.
3. Intentional or persistent neglect, damage, or injury by the tenant to the property of landlord.
4. Constant violation by the tenant of the rules and regulations of landlord if signed by tenant or incorporated in the lease with a a copy being given to tenant.
5. Substantial breach of the terms and conditions of the lease agreement by the tenant.
6. Owners seek to occupy premises himself [sic].
7. Owner seeks to close premises down without permitting any further occupancy.
The plaintiffs urge that this section purports to establish what constitutes "just cause" for a landlord to refuse *299 to let or relet to a tenant. Oddly enough, while the term "just cause" is defined, nowhere does it appear in the substantive provisions of the ordinance. Therefore, the term is of no legal effect. The River Edge ordinance, nearly identical in all other respects, is devoid of such a provision. Some verbiage and part of the format of the ordinance leave much to be desired. But this is not a basis for invalidation.
The claim is that the ordinance is clearly incompatible with N.J.S.A. 2A:18-53 et seq. That statute grants to a landlord a summary remedy for recovery of his premises under certain conditions.
A municipality may not legislate in a field already subject to state statutory law or regulation. Mogolefsky, v. Schoem, 50 N.J. 588, 598 (1967). And it is elementary that in exercising its police power, a municipality may not legislate in conflict with state statutes. Ringlieb v. Parsippany-Troy Hills Tp., 59 N.J. 348 (1971); Kennedy v. Newark, 29 N.J. 178, 186 (1959).
Assuming that section 1(e) of the ordinance sets forth the grounds for a landlord to refuse to rent his premises, the statutory law (N.J.S.A. 2A:18-53) does not contradict the right to possession by that landlord. It deals only with the remedy if the right otherwise exists. It follows that legislation conditioning the right to evict does not encroach upon the statutory remedies. These ordinances will not impinge upon that remedy existent in the field of landlord and tenant relationships. As Chief Justice Weintraub observed in Summer v. Teaneck Tp., 53 N.J. 548 (1969):
Each of the governmental agencies concerned is charged with guarding a separate public interest. In Re Mattera, 34 N.J. 259, 266-267 (1961). There is good reason thus to distribute the total power of the State. [at 557]
Further, even if one assumes that the term "just cause" in section 1(e) is a substantive part of the ordinance and limits the landlord's privilege to relet, rent leveling cannot be said to be so intertwined with control of evictions that *300 the municipal governing body intended both or none. Some control of maximum rents is itself conducive to the purpose of assuring continued occupancy. To be sure, direct control of evictions is an additional and a more direct technique; yet control of maximum rents is itself an intelligent partial solution. It would be unreasonable to assume that the municipality, if aware of its lack of power to control evictions directly, would do nothing at all to meet the emergency it found to exist. See Wagner v. Mayor, etc., Newark, 42 N.J. Super. 193, 210 (Law Div. 1956), wherein Chief Justice (then Judge) Weintraub decided this legal point, which observations as such were not reversed or negated in the Supreme Court opinion of the former Chief Justice Vanderbilt, 24 N.J. 467 (1957). Therefore, control of evictions, if it exists at all, does not render the entire ordinance invalid. Section 19 of Fort Lee and section 18 of River Edge provide for severability. Section 1(e) may be invalid; the remainder of the ordinance stands. Kennedy v. Newark, 29 N.J. 178, 187 (1959); Van Itallie v. Franklin Lakes, 28 N.J. 258, 276 (1958); Economy Ent., Inc. v. Tp. Com. of Manalapan Tp., 104 N.J. Super. 373, 377 (App. Div. 1969).

IV

CONSTITUTIONAL OBJECTIONS  TAX SURCHARGES
The tax provisions of sections 7 and 9 of the Fort Lee ordinance are brought into play in a further challenge by plaintiffs. It is urged that section 7 which requires the tenant to pay his pro rata share of tax increases "in 6 monthly payments, commencing July 1st of each year" is arbitrary to the extent that the landlord is obligated to pay his taxes for the first two quarters on February 1 and May 1. The contention is that a landlord is thereby required to "carry" his tenant for six months. (The River Edge ordinance provides for a 12-month payment schedule.)
*301 This provision is not so arbitrary or oppressive as to constitute a violation of due process. Ebler v. Newark, 54 N.J. 487 (1969). Landlords typically "carry" tenants where leases provide for fixed rentals. Compensation for tax increases must frequently await the termination of the lease or outcome of certain appeals or contingencies which may occur after the actual increase. The tax increase each year is not determined until receipt of the bill on or about July 1 for that year reflecting the increase and charging it in the third and fourth quarters (August 1 and November 1) of that year. The tenant will substantially be paying during the same period as the landlord. If anything, this provision allows for compensation at an earlier date than usual since it comes regardless of whether the lease has or has not been terminated.
The second aspect of the attack bottomed on the taxation provisions relates to sections 9 of both ordinances. These sections require a landlord who successfully prosecutes a tax appeal to pass on to his tenants 50% of any reduction in taxes realized. The plaintiffs contend that this provision may be read as to require a sharing of reductions that are related to increases for years prior to the effective date of the ordinances.
The general guidelines for construing legislative enactments bear repetition at this point. There is a presumption in favor of the validity of an act. McDonald v. Board of Election Com'rs of Chicago, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); United States v. National Dairy Products Corp., 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); Stothers v. Martini, 6 N.J. 560, 567 (1951). Unless its repugnancy to the Constitution is so manifest that it leaves no room for reasonable doubt, the act should be held constitutional. Behnke v. New Jersey Highway Authority, 13 N.J. 14, 25 (1953). Further, an act of the Legislature should not be declared void for unconstitutionality when construction can be given to it which will not have that effect. While a forced or unnatural construction *302 is to be avoided, the court has a duty to construe the statute so as to render it constitutional if it is reasonably susceptible to such a construction. Woodhouse v. Woodhouse, 17 N.J. 409, 416 (1955); Scales v. United States, 367 U.S. 203, 211, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961).
The cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid a serious doubt the rule is the same. [N.L.R.B. v. Jones and Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937).]
See Local Bd. of Health of Berkeley Tp. v. Johnson, 73 N.J. Super. 384, 392 (App. Div. 1962); Adams Newark Theatre Co. v. Newark, 22 N.J. 478 (1956), aff'd 354 U.S. 931, 77 S.Ct. 1395, 1 L.Ed.2d 1533 (1957).
In the situation at hand, the relevant sections are more susceptible to a construction which would avoid the constitutional pitfalls presented by plaintiffs. If the respective sections 9 were to be construed to require the sharing of tax reductions realized for any year prior to 1972, they could not pass constitutional muster. Accordingly, the court rejects the construction contended for by plaintiffs and holds that the relevant sections must be construed and applied to comport with due process.

V

CONSTITUTIONAL OBJECTIONS  DELEGATION OF POWERS TO ADMINISTRATIVE BOARDS
A further attack is directed at the provisions creating the respective Rent Leveling Boards.[1] Sections 11 and 12 of the *303 Fort Lee ordinance and section 10 of the River Edge Ordinance are virtually identical in their terms. The latter states:
Section 10. There is hereby created a Rent Leveling Board within the Borough of River Edge. Said Board shall consist of 2 landlords, 2 tenants, and one member appointed by the Mayor. The Mayor shall appoint a qualified person to this board at his sole discretion.
The Rent Leveling Board is hereby granted, and shall have and exercise, in addition to other powers herein granted, all powers necessary and appropriate to carry out and execute the purposes of this ordinance including, but not limited to, the following:
(a) To issue and promulgate such rules and regulations as it deems necessary to implement the purposes of this act, which rules and regulations shall have the force of law until revised, repealed or amended from time to time by the Board in the exercise of its discretion, providing that such rules are filed with the Borough Clerk.
(b) To supply information and assistance to landlords and tenants to help them comply with the provisions of this ordinance.
(c) To hold hearings and adjudicate applications from landlords for additional rental as determined by Section 12 of this ordinance.
(d) To hold hearings and adjudicate applications from tenants for reduced rental as determined by Section 13 of this ordinance.
The Rent Leveling Board shall give reasonable opportunity to be heard to both landlord and tenant before making any determination.
Sections 10 and 13 of the Fort Lee ordinance and sections 11 and 12 of the River Edge ordinance provide for various appeals from the respective boards to the governing bodies. As in all administrative agencies, there are appeals to the courts.
Plaintiffs claim that the ordinances result in illegal delegations of power to the respective administrative agencies. Sections 11 of both ordinances make it clear that the boards perform primarily and exclusively advisory functions and provide for final action only if approved by the governing body. Landlord and tenant may appeal those findings.
It has long been established that legislative delegations of power are permissible so long as they embody sufficient basic standards. As Justice Jacobs observed in State v. Hotel Bar Foods, Inc., 18 N.J. 115 (1955):
*304 The exigencies of modern government have increasingly dictated the use of general, rather than minutely detailed standards and they have, for the most part, received the approval of our courts. [at 124; citations omitted].
And Judge Matthews, in Bayonne v. Palmer, 90 N.J. Super. 245 (Ch. 1966), aff'd 47 N.J. 520 (1966), noted:
If it should be required that legislation authorizing or implementing a governmental scheme devised for the well-being of the people should contain details and precise rules of action for the persons entrusted with the operation of the plan, I am afraid that governmental programs requiring the use of administrators or experts would soon come to a halt  bogged down under a morass of legislation and requests for interpretation of the regulations embodied therein. If the Legislature is required to lay out detailed rules, it would be bound to thwart its own purpose. Legislators cannot be held to perfect anticipation in complex and changing circumstances. Broad principles often have to suffice. [90 N.J. Super. at 287; citations omitted]
Further, in Schierstead v. Brigantine, 20 N.J. 164, 169 (1955), it was stated that a court in ascertaining the basic standards is obligated to look beyond "the four corners of the particular section * * * [and] examine the entire act in the light of its surroundings and objectives." See also Burton v. Sills, 53 N.J. 86, 90-92 (1968); Ward v. Scott, 11 N.J. 117, 123-125 (1952).
The foregoing considerations and precedential authority are equally pertinent to the present situation. The boards' responsibilities and powers are specifically, albeit broadly, set forth in the various subsections therein. Their advisory roles are mandated by the ordinances. The fact that the rules and regulations promulgated by the boards are to have the force of law does not detract from that advisory character. Appeal to the various governing bodies is always available. The courts provide a source of ultimate review. That is the case with any administrative body.
It cannot be seriously argued that the administrative agencies are to be devoid of the rule-making power. And it is sheer folly to suggest that those rules should not have the force of law. Such contentions, if accepted as valid, *305 would have the effect of emasculating all administrative bodies and rendering the operations of government lethargic and chaotic. If the legislative body establishes the basic policies, it may commit to an administrative agency the authority to make rules and regulations to effectuate them. Governmental activity is becoming more complex. And the capacity to perform the full legislative role is impossible. This is equally true at the municipal level. A municipal administrative board will be in closer and more immediate touch with the problem than the legislative body. It is subject to continuous check by the governing body.
The ordinances contain sufficient constitutional standards. The rule of reasonableness always confines the exercise of municipal power and the judicial superintendence thereof. There is no illegal delegation of those powers inherent in the ordinances under review.

VI

PREEMPTION BY STATE OF NEW JERSEY
A crucial issue is the power of a municipality to enact the ordinance in question in view of preemption by the State. In Wagner v. Mayor and Municipal Council of Newark, 24 N.J. 467 (1957), relied upon heavily by plaintiffs, the rent control ordinance of Newark was declared void. Chief Justice Vanderbilt, in reversing the lower court decision, rested on two grounds. The first dealt generally with the municipality's authority to enact such an ordinance. The second ground concerned preemption of that ordinance by then effective state legislation. Wagner, supra at 480.
The relevant facts of that case reveal that on June 21, 1956 Newark adopted a rent control ordinance to become effective upon the June 30, 1956 expiration of the state rent control statute. Basically, the ordinance created a housing rent control commission and prohibited rental increases in excess of the lawful rents on June 30, 1956.
*306 The Legislature subsequently enacted N.J.S.A. 2A:42-56 to 73, which was entitled:
An Act authorizing certain municipalities to adopt, make, amend, repeal and enforce ordinances to provide for the regulation of rentals and the possession of housing space, with respect to certain properties, and to make necessary appropriations; providing for county rent control review boards in certain cases, imposing certain duties upon the State Rent Control Director, conferring jurisdiction on the county district courts, in certain cases * * *.
This special act became law on July 31, 1956 and was made retroactive to midnight June 30, 1956. It granted some 35 municipalities the authority to adopt ordinances for the purpose of regulating rental charges. In addition, the law permitted rent increases of 15% and 20% in various instances not here relevant. Newark did not choose to take the appropriate action conforming to the statute, but instead insisted upon the effectiveness of its own previously enacted rent control ordinance.
The general principles governing the concept of preemption by the State call for the voiding of a local enactment where it tends to conflict with a state statute, or where there is a perceptive intention on the part of the Legislature to occupy the entire field with which the local enactment endeavors to deal. Both of these conditions were relied upon by the Wagner court in reaching its decision. It was decided that the Newark ordinance conflicted with certain provisions of the state enactment and the Legislature had clearly intended to preempt the entire field of rent control with the comprehensive law approved therein.
Plaintiffs point to the expiration clauses of the statute under consideration in the Wagner case as a possible expression of the required legislative intent. N.J.S.A. 2A:42-72 provided:
Every ordinance adopted under the authority of this act shall cease to be in effect and operation not later than December 31, 1957, and every such ordinance shall provide therein an expiration date; *307 but, in any event, every such ordinance shall cease to be in effect and operation on December 31, 1957, unless it shall have sooner ceased to be in effect and operation.
N.J.S.A. 2A:42-73 similarly provided:
This act shall take effect immediately but shall be inoperative in any municipality until it shall be adopted by ordinance of the governing body of such municipality, and no referendum to the voters of the municipality shall be required and this act shall cease to be in effect on December 31, 1957. [Emphasis added]
The expiration clauses of the legislation quoted above are not indicative of a conclusive preemptive intent. N.J.S.A. 2A:42-72 does not endeavor to forever foreclose the field of rent control from municipal legislative authority. It provides merely that the ordinances under the 1956 act were to become ineffective on the specified date. And the fact that in N.J.S.A. 2A:42-73 the Legislature permitted the state legislative scheme to expire cannot conclusively lead to such an intent. It is difficult to perceive how the expiration of one statute can dictate the result of the present controversy some 15 years late.
In deciding further whether or not these statutory provisions serve to require a conclusion of preemption, two recent New Jersey Supreme Court decisions cast some light on the issue. In Ringlieb v. Parsippany-Troy Hills Tp., 59 N.J. 348 (1971), a municipality sought to regulate solid waste disposal within its boundaries. The Supreme Court held the action to be barred by two state statutes which precluded municipal authority. The statutes were held to comprise "a comprehensive plan on the part of the State to control all facets of this industry." Id. at 350. Further, the court observed that the statutes conflicted with or duplicated in several respects that which was required by the ordinance. Thus, duplication and comprehensive legislation served to warrant a finding that the field had been preempted.
Chief Justice Weintraub in Summer v. Teaneck Tp., supra, was faced with a claim that a local "blockbusting" *308 ordinance was preempted by a state statute creating the Real Estate Commission and by a rule the Commission adopted thereunder. The Chief Justice observed that "[a] municipality may not contradict a policy the Legislature establishes." 53 N.J. at 554. Further, he said:
* * * an ordinance will fall if it permits what a statute expressly forbids or forbids what a statute expressly authorizes. Even absent such evident conflict, a municipality may be unable to exercise a power it would otherwise have if the Legislature has preempted the field. This follows from the basic principle that local government may not act contrary to State law. But an intent to occupy the field must appear clearly. Kennedy v. City of Newark, 29 N.J. 178, 187 (1959). It is not enough that the Legislature has legislated upon the subject, for the question is whether the Legislature intended its action to preclude the exercise of the delegated police power. Masters-Jersey, Inc. v. Mayor and General Council of Borough of Paramus, 32 N.J. 296 (1960). Hence the fact that the State has licensed a calling may not be enough to bar local licensure to protect an additional value of local concern. Belleville Chamber of Commerce v. Town of Belleville, 51 N.J. 153, 157 (1968). The ultimate question is whether, upon a survey of all the interests involved in the subject, it can be said with confidence that the Legislature intended to immobilize the municipalities from dealing with local aspects otherwise within their power to act. [Id. at 554-555; emphasis added]
The Supreme Court found in Summer that the "Legislature did not intend to commit all facets of the public welfare in this area to the Real Estate Commission." Id.
It must be remembered that Chief Justice Vanderbilt in writing Wagner bottomed his decision on the Rent Control Act of 1956 which took effect on termination of federal controls. He indicated that the Legislature had responded to the 35 municipalities seeking rent control. Thus, state preemption clearly existed in Wagner. At no time was the decision of the New Jersey Supreme Court intended to nullify an ordinance covering rent control or rent leveling absent a state statute preempting the field. And the Chief Justice in Wagner referred to the preamble of the statute where clearly the intention on the part of the Legislature was to recognize a public emergency in housing in certain *309 areas of the State and where the statutory course of action was declared to be "in the best interests of the people `of the state as a whole.'"
The significance of this recognition is important: (1) that local emergencies in housing affect the interests of the people of the entire State, and (2) that the Newark ordinance fell because it did not take appropriate action in the light of the special law then passed by the Legislature to include the 35 municipalities. That legislation provided that municipalities could not adopt rent control where the option was given to them under the statute. It did not say that a municipality could not adopt rent control for all time. That was undecided.
It has been made clear that the statute upon which the Wagner court based its decision is no longer in effect. See N.J.S.A. 2A:42-72, 73. The decisional law as to preemption has been examined. Accordingly, it is necessary to look to present statutory expressions of possible preemptive intent.
We have no state legislation embracing rent leveling or rent control. Bills have been introduced in the Senate and Assembly. A public hearing is being held. The fact that bills are presently pending which would establish a statewide rent control program is not conclusive of a legislative scheme to occupy the entire field. The effort is underway. The outcome is still questionable.
N.J.S.A. 2A:42-74 is strongly urged by the plaintiffs in this respect. That statute provides, among other things, that municipalities may control rents of apartments which are deemed to be substandard.
I find that the Legislature did not intend to preempt all aspects of rent control by the enactment of that statute. The legislative concern reflected in N.J.S.A. 2A:42-74 is not supportive of an intent to preclude all local regulation of rent. The primary thrust of the statute is directed toward the problem of substandard housing and not exorbitant rents. The legislative findings specifically recite:
*310 (a) Many citizens of the State of New Jersey are required to reside in multiple dwelling units which fail to meet minimum standards of safety and sanitation and are compelled to pay rents disproportionate to the value of the facilities;
(b) It is essential to the health, safety and general welfare of the people of the State that owners of substandard multiple dwelling units be encouraged to provide safe and sanitary housing accommodations for the public to whom such accommodations are offered;
(c) It is necessary, in order to insure the improvement of substandard multiple dwelling units, to authorize the governing bodies of municipalities to enact and impose rent controls on substandard multiple dwelling units until such dwelling units satisfy minimum standards of safety and sanitation.
Of course, the problems of substandard dwellings and exorbitant rentals are not entirely unrelated. Indeed, they both stem from the critical condition of the housing market. Thus, the desperate need for housing enables the unscrupulous to exact exorbitant rents and, at the same time, to avoid the responsibility of maintaining adequate facilities.
But the similar genesis of the problems does not warrant the conclusion that by authorizing municipalities to control rents of substandard dwellings, the Legislature also intended to prohibit such regulation over other housing facilities. The substandard dwelling statute did not carve out a preemption of rent control for all purposes or for all types of buildings. It was limited to the single purpose set forth in the statute.
There is presently no comprehensive State plan for rent leveling in New Jersey. There is certainly no clear intent on the State's part to preempt the field and preclude local activity. The ordinances under consideration present no conflict with or duplication of any state statutes. Therefore, the field of rent leveling has not been preempted by the State Government.

VII

PREEMPTION BY FEDERAL GOVERNMENT
The preemption issue is again raised by the plaintiffs in connection with federal legislation in the area of rent *311 controls. The foundation of the federal preemption attack is the Economic Stabilization Act of 1970. P.L. 91-379, 84 Stat. 799 as amended. For a summary of the legislative enactments, executive directives and regulations pertaining thereto, see Brookchester Inc. v. Matthews, 118 N.J. Super. 565, 568-571 (Cty. D. Ct. 1972). This act empowered the President of the United States "to issue such orders and regulations as he may deem appropriate to stabilize prices, rents, wages, and salaries at levels not less than those prevailing on May 25, 1970." Pursuant to that authority, by Executive Order No. 11627, 12 U.S.C.A. § 1904 note, the President has promulgated a comprehensive scheme of controls over prices, rents and wages and delegated the administration of those controls to a Pay Board and Price Commission. The rules and regulations pertaining to rent are to be found in chapter III, part 300 of the Price and Rent Stabilization Regulations which became effective November 14, 1971, 1 U.S. Code Cong. & Adm. News, 335, 443-453 (January 18, 1972).
A detailed analysis of the rules and regulations of the "Phase II" program are not necessary in this case. Suffice it to say that they represent a comprehensive and emphatic concern by the Federal Government with the stabilization of rents. However, a review of the various rules and regulations indicates no intent to require exclusive enforcement of those provisions by the Price Commission. In Brookchester Inc. v. Matthews, supra, the Bergen County District Court recently exercised its jurisdiction over those regulations in the course of a summary dispossess proceeding. In that case it was held that an assertion that a landlord failed to comply with the rules and regulations of the Price Commission would constitute a defense to an action for possession based on the nonpayment of rent by the tenant.
It is of course manifest that the municipalities of this State must comply with the comprehensive economic program set forth in Phase II. To that end, they are powerless to enact ordinances which contradict or conflict with its *312 provisions. However, the ordinances under review in no way transgress the promulgated rules and regulations adopted pursuant to Phase II. Rather, they police the various enactments in a manner which is more stringent than the program itself. And, needless to say, any actions taken by the rent leveling boards and the governing bodies are subject to review by the Price Commission. See e.g. Price and Rent Stabilization Regulations §§ 301.106(d), 301.108, U.S. Code Cong. & Admin. News, supra at 446-447.
Plaintiffs claim that § 301.106(a), (c) of the aforesaid regulations prohibit the defendant municipalities from entering into the field of rent control. Id. Those regulations provide for exceptions to the guidelines established by the Price Commission in cases where a landlord is under the supervision of a local rent control program which had been in existence prior to November 14, 1971. Although enacted later, the provisions of the ordinances under review make no exceptions to the Price Commission guidelines.
Viewing the ordinances as consistent with the federal program, they cannot be said to contravene the Supremacy Clause of Article VI of the United States Constitution. Just as our courts may enforce the provisions of the federal enactments, so may our municipalities act consistently therewith. In view of the serious state of the nation's economy and the difficult and cumbersome task of administering anti-inflationary measures taken by the Federal Government, it behooves all branches of government, both state and local, to aid in the enforcement of those measures.

VIII

INHERENT POLICE POWER OF MUNICIPALITY TO LEGISLATE ON RENT CONTROL
The final inquiry and gravest challenge to the ordinances under review concern the inherent police power of the defendant municipalities to legislate on the subject matter involved. It is fundamental that a municipal corporation *313 is a government created by the Legislature possessing enumerated powers only. Accordingly, a municipality must act within the bounds of its delegated authority. Ringlieb v. Parsippany-Troy Hills Tp., supra; Roselle v. Public Service Elec. & Gas Co., 35 N.J. 358 (1961); Bucino v. Malone, 12 N.J. 330 (1953); Fred v. Mayor, etc., Old Tappan, supra; Edwards v. Mayor, etc., Moonachie, 3 N.J. 17 (1949). The New Jersey Constitution qualifies that axiom by declaring that laws concerning municipal corporations be liberally construed in their favor and shall include not only powers expressly granted but also those which are necessary or incidental to the powers conferred. N.J. Const. (1947), Art. IV, § VII, par. 11.
A restriction on the municipal police power has, of course, always been the caveat that matters of local concern only are proper subjects for local activity and regulation. So, for example, it was observed in Wagner and Summer, supra, that a municipality cannot legislate upon the subject of wills or title to real property. And Wagner went on to include in the category of general state affairs, the subject of landlord-tenant relations.
The continuing vitality of Wagner is indeed subject to question and evaluation. Not only have subsequent Supreme Court decisions rendered its authority with respect to rent control questionable, but expansive tendencies in the treatment of municipal power and social conditions foster a contrary ruling. Chief Justice (then Judge) Weintraub, writing in the lower court in Wagner eloquently expounded upon the increasing scope of police power and municipal authority:
The history of the police power is a story of ever-increasing restraint upon property rights. With economic growth, industrial innovations, greater concentrations of population, phenomenal mobility, an exercise of property rights which at one time was innocuous may today menace the public welfare. The police power must include a vast reservoir if government is to be equal to the obligation to govern. The march of events has required new legislative expressions at state level. Local demands have kept pace. The delegable police power must be equal to the task of meeting them. Today many municipalities have populations exceeding those of some states. Manifestly, *314 the delegable police power may not be said to be constitutionally fixed in terms of the problems of an ancient village. [42 N.J. Super. at 205-206; citations omitted]
Those observations have gained increasing importance in recent years. The Wagner case was decided in the context of traditional acceptance of state and national control over pressing socio-economic crises. The statutes in Wagner were rooted in housing emergencies created by a war-time economy. Not long before, the nation looked toward the President for solutions to the economic despair which plagued the world.
The predominant role exercised by the Federal and then the State Governments in overseeing the socio-economic affairs of the nation was still present  although foreseeably decreasing  in 1957 when Wagner was decided. Since that time, local autonomy has gained an ever broadening vantage; and now we find ourselves in the midst of an era in which the cry for the extension of community control over multifaceted local problems is widespread.
New Jersey Supreme Court decisions reflect with crystal clarity the foregoing phenomena. Summer v. Teaneck Tp., supra, presented the concise embodiment of the recognition of the necessity for local control in dealing with pressing social problems. Chief Justice Weintraub upheld therein Teaneck's authority to deal with the pernicious practice of "blockbusting." While noting that the State had legislated generally in the field of discrimination and had authorized the Real Estate Commission to curtail predatory real estate practices, the Chief Justice adopted a functional approach to the problem. Blockbusting, it was found, depended to a large extent upon the local scene.
Significantly, in his opinion, the Chief Justice in Summer cited Wagner for the general proposition concerning municipal authority. Yet, in delineating the types of matters over which a municipality has no control, no mention was made of landlord-tenant relations. Wills and title to real property were the sole examples.
*315 The Supreme Court subsequently repeated its affirmance of the expanding scope of municipal authority in New Jersey Builders Ass'n v. Mayor etc., E. Brunswick Tp., 60 N.J. 222 (1972). Again, a functional approach was taken to the consideration of municipal powers, notwithstanding active state regulatory activity in the field of housing and contractors generally.
Justice Mountain, in New Jersey Builders Ass'n, supra, was confronted with an ordinance seeking to regulate building contractors by way of amendment to the building code. Reference was made to irresponsible builders making it necessary that qualifications be disclosed and a bond provided. Although the ordinance was struck down, the court stated: "We know of no reason why, should the Legislature so wish, building contractors might not be brought under similar supervision,"  referring to electricians and plumbers. 60 N.J. at 225. The court held that the business of a building contractor is clothed with a public interest and declared: "We readily conclude that the occupation of building contractor may, by an appropriate exercise of the police power, be made subject to reasonable regulation." Id. at 226.
As in the case of Summer, it was argued that, even if legally permissible at the state level, there had been no delegation of such power to municipalities. In this connection it was pointed out that N.J.S.A. 40:48-1(13) (authorizing regulation of construction of buildings) and N.J.S.A. 40:52-1 (enumerating lists of occupations that may be licensed by a municipality) make no reference to builders.
Both Chief Justice Weintraub in Summer and Justice Mountain in New Jersey Builders Ass'n then cite N.J.S.A. 40:48-2, which reads as follows:
Any municipality may make, amend, repeal and enforce such other ordinances, regulations, rules and by-laws not contrary to the laws of this state or of the United States, as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and *316 welfare of the municipality and its inhabitants, and as may be necessary to carry into effect the powers and duties conferred and imposed by this subtitle, or by any law.
Both opinions state that this provision has been held to accomplish a broad grant of police powers to municipalities "in addition," rather than merely ancillary, to the sundry detailed authorization for municipal actions contained in the aforementioned statutes.
Both opinions refer to Wagner which states that "the grant `relates to matters of local concern which may be determined to be necessary and proper for the good and welfare of local inhabitants, and not to those matters involving state policy or in the realm of affairs of general public interest and applicability.'" 53 N.J. at 552, 553; 60 N.J. at 226.
And Justice Mountain, although invalidating the ordinance for failure to particularize the conditions of proposed bond and to define clearly the word "builder" (held it to be vague and imprecise), said:
It is true that delegated police power is limited to matters of local concern and forms no basis for municipal intrusion into matters "* * * involving state policy or in the realm of affairs of general public interest and applicability." Wagner v. Mayor and Municipal Council of Newark, 24 N.J. 467, 478 (1957). There is, however, no basis here for invoking this limitation. We are dealing with a matter that may well be of local concern. The competence and responsibility of building contractors may differ widely throughout the state. Varying conditions, including, for example, the existence or lack of sufficient housing, may very well give rise to problems in some localities that find no counterpart in others. We think that the regulation and supervision of building contractors is a matter that may well call for different treatment in different parts of the State. [60 N.J. at 227; emphasis added]
He continued:
We see no reason, as an abstract proposition, why a municipality, as well as the State, may not employ a bond requirement as an appropriate means of pursuing its effort, directed in the public interest, to regulate and supervise building contractors. But resort thereto *317 must, in its impact, be reasonable and not oppressive. Furthermore the mechanics of the arrangement must be carefully spelled out and not left in doubt. [Id. at 231]
This reasoning closely parallels the words of Chief Justice Weintraub in Summer where he most succinctly observes:
Blockbusting does not come within that limitation. Blockbusting depends very much upon the local scene and varies accordingly in its intensity and hurt. Although the evil warrants the concern of the State itself, it would not be inappropriate to permit the municipalities also to wrestle with it. There is no inevitable need for a single statewide solution or for a single statewide enforcing authority. On the contrary, it may be useful to permit municipalities to act, for, being nearer the scene, they are more likely to detect the practice and may be better situated to devise an approach to their special problems. Then, too, municipalities may provide enforcement personnel the State has not supplied in adequate numbers and hence be able to nip an offensive movement with which a State agency could not deal until after the event.
We note in this connection that a relevant federal statute assumes the appropriateness of municipal action in this general area. Thus the Fair Housing Act of 1968, which includes a condemnation of blockbusting, 42 U.S.C.A. § 3604(e), stipulates that its provisions shall not be construed to invalidate any law of a State or "political subdivision of a state," 42 U.S.C.A. § 3615, and speaks of cooperation by the Secretary of Housing and Urban Development "with State and local agencies charged with the administration of State and local fair housing laws," 42 U.S.C.A. § 3616. Many municipalities have legislated with respect to blockbusting, see Fair Housing Laws (Housing and Home Finance Agency, Sept. 1964), pp. 234-238, and a fair-housing ordinance which included a blockbusting provision was upheld in Chicago Real Estate Board v. City of Chicago, 36 Ill.2d 530, 224 N.E.2d 793 (Sup. Ct. 1967). With respect to the power of a municipality to deal with racial discrimination, see District of Columbia v. John R. Thompson Company, Inc., 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953). [53 N.J. at 553; emphasis added]
The application in New Jersey Builders Ass'n, supra, of the standard initially utilized in the Summer case, i.e. whether varying conditions exist with respect to the subject sought to be controlled, represents an innovative approach not therefore invoked per se. Thus, in Wagner, traditional concepts of municipal authority coupled with conflicting state legislation led to the conclusion reached therein. But even as Wagner was being decided, the increasing role of *318 municipal regulation was generating more liberal attitudes in upholding that regulation.
It is clear then, that the court has come near to closing the circle left open with Wagner. Applying the criteria established in Summer and New Jersey Builders Ass'n, supra, the conclusion that Wagner no longer governs in the field of housing generally and rent control specifically is compelling and irresistible. Wagner, as previously noted, was adjudicated under the conditions of comprehensive state Legislation. The facts in the instant matter are crucially distinguishable. Rent control, with the exception of rare instances in which it has been involved in the context of substandard housing, has been entirely absent in our State for some 15 years. The subject has been broached again in the context of a severe lack of available housing. This was precisely the condition referred to by Justice Mountain in New Jersey Builders Ass'n, supra.
How then does the subject of rent control measure up to the standards set forth in the recent Supreme Court decisions? The housing market fluctuates precipitously in different areas of the State. Vacancy rates may be 0.01% in some municipalities and 3.00% in others. More significantly, some municipalities, indeed, most municipalities have absolutely no cause for rent regulation because of the virtual absence of multi-family dwelling units.
Public or judicial notice may almost be taken of the facts of rent fluctuation in the two boroughs involved at this time. The population growth and the rent increase fluctuations are matters of common knowledge not requiring the taking of testimony. The Appellate Division took "judicial notice of the fact that there is an acute shortage of low income housing in the City of Newark, and that such housing which exists is frequently not in full compliance with the city's housing ordinances and building codes." Samuelson v. Quinones, 119 N.J. Super. 338 (App. Div. 1972). There are other municipalities equally affected. Those facts cry out for legislation. Their problem varies *319 greatly in intensity and hurt. The municipalities should be permitted to wrestle with it. It is also common knowledge that there is no need for a statewide solution. The problem is localized in various municipalities for obvious reasons. The city fathers are close to the scene in those areas.
And the argument as to municipal regulation being wasteful and expensive is empty. There is no need for a statewide enforcing authority any more than one was needed in Summer. The number of municipalities requiring rent leveling is very small compared to 567 municipalities in New Jersey. Rent control is confined to the boundaries of the borough. It stops there. The arguments against municipal legislation for wills and no-fault insurance are self-evident. But regulations of building inspectors, blockbusting and racial discrimination have been upheld on a municipal level.
The tax burdens are different from town to town; the surroundings are different from town to town; the demands for housing are different from town to town; the community distances to the metropolitan areas are different from various towns. Not all municipalities open onto the George Washington Bridge giving them a unique geographical location and attendant problems caused thereby. One of these problems is housing  and the right to continue to be housed  and the right not to be uprooted annually for unfair and unreasonable economic reasons.
Justice Holmes in Block v. Hirsh, 256 U.S. 135, 156, 41 S.Ct. 458, 459, 65 L.Ed. 865, 871 (1921), in discussing the local nature of a particular type regulation said:
These cases are enough to establish that a public exigency will justify the legislature in restricting property rights in land to a certain extent without compensation. But if to answer one need, the legislature may limit height to answer another it may limit rent.
Both are exercises in the general welfare.
Judge Wright in Javins v. First National Realty Corporation, 138 U.S. App. D.C. 369, 428 F.2d 1071 (D.C. Cir.1970), made this statement:
*320 When American city dwellers, both rich and poor, seek "shelter" today, they seek a well known package of goods and services  a package which includes not merely walls and ceilings but also adequate heat, light and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation, and proper maintenance. cert. den. 400 U.S. 925 (1970), 91 S.Ct. 186, 27 L.Ed.2d 185. Id. at 1074.
The "package" referred to by Judge Wright must include some safeguards against arbitrary uprooting of the apartment dweller. The landlord always has the assurance of his rent being paid pending any appeal by a tenant. What can the intermediate harm be to an apartment owner so long as his rentals are guaranteed during the effective periods of these ordinances? Javins held that housing code violations which arise during the term of the lease affect the tenant's obligation to pay rent. Javins relied upon Brown v. Southall Realty Co., 237 A.2d 834 (D.C. App. 1968), which went further and held that unsafe and unsanitary conditions in violation of the local housing code existing at the beginning of the tenancy and known to the landlord rendered any lease of those premises illegal and void. Marini has not gone so far as to incorporate local housing codes into every lease agreement. See Samuelson, supra, 119 N.J. Super at 338. These cases again demonstrate the extent to which courts have reevaluated their positions as to landlord and tenant relationships. And Javins has the precedential stamp of the United States Supreme Court's refusal to take the case for review.
Of course, private interests of owners must and will be protected. But when the scales weigh too heavily in favor of the landlord and against the interest of the tenant, proprietary interests must give some ground. Chief Justice Weintraub, in State v. Shack, 58 N.J. 297 (1971), said:
Property rights serve human values. They are recognized to that end, and are limited by it.
A man's right in his real property of course is not absolute. It was a maxim of the common law that one should so use his property as not to injure the rights of others. Broom, Legal Maxims (10th ed. *321 Kersley 1939), p. 238; 39 Words and Phrases, "Sic Utere Tuo ut Alienum Non Laedas," p. 335. Although hardly a precise solvent of actual controversies, the maxim does express the inevitable proposition that rights are relative and there must be an accommodation when they meet. Hence it has long been true that necessity, private or public, may justify entry upon the lands of another. [Citations omitted]
The subject is not static. As pointed out in 5 Powell, Real Property (Rohan 1970) § 745, pp. 493-494, while society will protect the owner in his permissible interests in land, yet
"* * * [S]uch an owner must expect to find the absoluteness of his property rights curtailed by the organs of society, for the promotion of the best interests of others for whom these organs also operate as protective agencies. The necessity for such curtailments is greater in a modern industrialized and urbanized society than it was in the relatively simple American society of fifty, 100, or 200 years ago. The current balance between individualism and dominance of the social interest depends not only upon political and social ideologies, but also upon the physical and social facts of the time and place under discussion."
Professor Powell added in § 746, pp. 494-496:
"As one looks back along the historic road traversed by the law of land in England and in America, one sees a change from the viewpoint that he who owns may do as he pleases with what he owns, to a position which hesitatingly embodies an ingredient of stewardship; which grudgingly, but steadily, broadens the recognized scope of social interests in the utilization of things. * * *
To one seeing history through the glasses of religion, these changes may seem to evidence increasing embodiments of the golden rule. To one thinking in terms of political and economic ideologies, they are likely to be labeled evidences of `social enlightment,' or `creeping socialism' or even of `communistic infiltration,' according to the individual's assumed definitions and retained or acquired prejudices. With slight attention to words or labels, time marches on toward new adjustments between individualism and the social interests."
This process involves not only the accommodation between the right of the owner and the interests of the general public in his use of his property, but involves also an accommodation between the right of the owner and the right of individuals who are parties with him in consensual transactions relating to the use of the property. Accordingly substantial alterations have been made as between a landlord and his tenant. See Reste Realty Corp. v. Cooper, 53 N.J. 444, 451-453 (1969); Marini v. Ireland, 56 N.J. 130, 141-143 (1970). [58 N.J. at 303, 305-306]
*322 Further social enlightenment was reflected in Marini, supra, when the Supreme Court accommodated the rights of the owner and tenant as to the condition and use of property. The agreement, per se, did not provide for this accommodation (tenant may repair and deduct cost from future rents). But profound and meaningful rules of law were made in New Jersey. Perhaps the label is different but the case under consideration is another reassessment of the rights of parties in the context of the right to shelter. Referring to the implied covenant, the court said:
Actually it is a covenant that at the inception of the lease, there are no latent defects in facilities vital to the use of the premises for residential purposes because of faulty original construction or deterioration from age or normal usage. And further it is a covenant that these facilities will remain in usable condition during the entire term of the lease. In performance of this covenant the landlord is required to maintain those facilities in a condition which renders the property livable. [at 144]
And:
It is of little comfort to a tenant in these days of housing shortage to accord him the right, upon a constructive eviction, to vacate the premises and end his obligation to pay rent. Rather he should be accorded the alternative remedy of terminating the cause of the constructive eviction where as here the cause is the failure to make reasonable repairs. See Reste Realty Corporation v. Cooper, supra, footnote 1, 53 N.J. pp. 462, 463. This latter course of action is accompanied by the right to offset the cost of such repairs as are reasonable in the light of the value of the leasehold against the rent. His pursuit of the latter form of relief should of course be circumscribed by the aforementioned conditions.
If, therefore, a landlord fails to make repairs and replacements of vital facilities necessary to maintain the premises in a livable condition for a period of time adequate to accomplish such repair and replacements, the tenant may cause the same to be done and deduct the cost thereof from future rents. [at 146]
And:
We realize that the foregoing may increase the trials and appeals in landlord and tenant dispossess cases and thus increase the burden of the judiciary. [at 147]
*323 The full impact of the need for governmental assistance by way of rent leveling is made when we note that over a third of our population lives in apartments or other rented housing.[1a] We are not discussing commercial establishments. The home, whether rented or owned, is the very heart of privacy in modern America. Man's place of retreat for quiet and solace is the home. Whether rented or owned, it is his sanctuary. Being uprooted and put into the street or moving from place to place is a traumatic experience.
These considerations make it eminently reasonable for a municipality which affords a vast number of apartment-type residences to enact the rent-leveling provisions embodied in the ordinances under review. Just as it may be advantageous for local authorities to check blockbusting practices and unscrupulous building contractors, so is it desirable to permit them to weigh the particular local housing market considerations in the administration of rent control.
The law cannot be so rigid that society is helpless when traditional concepts are not entirely adequate for new issues. This incursion upon traditions is slight. There is no need for alarm. Pandora's box will not be opened. The courts will exercise the necessary restraints  as always. Judicial imagination must be equal to this challenge.
The determination of the legal and constitutional validity of the ordinances involved in these proceedings must be resolved in the light of the accumulated social, political and economic developments. Lack of adequate housing, particularly for the poor and disadvantaged in urban areas and in the squalid, festering slums of the older cities, ranks high among the problems that are pressing for solution by governmental authority on every level. Problems involving the health, safety and general welfare of the public cannot be adjudicated in an intellectual vacuum.
*324 It is most difficult to put one's finger on what constitutes "rent gouging." It is an inanimate object, but deadly if left unattended. It has been the subject of public outrage. Its existence in the two boroughs has not been disputed. The problem is not with the private mortgage lenders. The climate is perfect and an abundance of money is available for placement. This segment of the economy is sound. But this cannot enable landlords to make excessively high profits at the expense of their tenants. Dramatic rent increases must be evaluated and checked, if necessary.
It is difficult to see ahead. The myriad of decisions throughout the country today relating to exclusionary, economic and fiscal zoning is a far cry from the decisions of five years ago. Oakwood at Madison, Inc. v. Madison Tp., 117 N.J. Super. 11 (Law Div. 1971); Southern Burl. Cty. NAACP v. Mt. Laurel Tp., 119 N.J. Super. 164 (Law Div. 1972).
Because the law must be an instrument for justice, yesterday's dissent is today's law review article urging tomorrow's promises of the necessary capacity for growth to meet changing needs. The law should be based on current concepts of what is right and just. Schipper v. Levitt & Sons, Inc., 44 N.J. 70 (1965).
And it is not the dispositive answer to point to the unfortunate situation relevant to local zoning and building practices. Exclusionary zoning is rapidly drawing the indignation of the courts and may no longer be sustained as a valid exercise of the police power. Yet, zoning has in other respects provided benefits to community growth. We must not assume that because municipalities have, in the past and present, perverted the zoning power to limit the number of available living units, the prerogative to control rents will result in oppressive and arbitrary practices.
Builders and real estate developers maintain that housing shortages can be partially solved by modernizing building codes and redesigning zoning standards for the more intelligent and economical use of the scarce supply of land. In *325 New Jersey 246 municipalities have codes written by the local officials. Another 235 municipalities have adopted model national codes. Some codes forbid the use of modern materials and methods. This results in costlier building.
On March 27, 1972 Governor William T. Cahill asked the New Jersey Legislature to approve a balanced housing plan for New Jersey which is revolutionary and most imaginative in scope. He referred to "artificially conceived zoning and planning devices which have bred abuses and distortions." He publicly attacked exclusionary zoning. He spoke of a uniform statewide building code. He proposed a state planning council that could designate "critical areas." Finally, he said that New Jersey must achieve a balance in housing: low, moderate and expensive, single and multi-family. He did not suggest that the balance need be equal nor should every community be the same. A two-acre plot is permissible for one who can afford this, and all apartments should not be unduly restricted so as to exclude senior citizens or the young couples.
All of this  the outline of the plans of the Chief Executive as well as some of the solutions of the builders  will go far in achieving a solution. And one day it will be realistically in force. But until then, this very concern of the State with the problems of housing and zoning further underscores the need for rent leveling at this time.
The rent-leveling bill introduced in the Legislature by Assembly Speaker Thomas Kean and under consideration would roll back rents to January 1, 1972 levels. Landlords are allowed limited increases but tied to the cost-of-living rises at the time of lease renewals. The cost of capital improvements are prorated over the life of the improvements with limitations. Other bills have been introduced in the Senate and the Assembly. Senators Clifford Case of New Jersey and Jacob Javits of New York have spoken for this legislation. It stops there. A failure to legislate is not legislation.
*326 Statements that rent control will hurt tenants, landlords, builders and homeowners are a myth. The ordinances under review have ample provisions for justifiable increases in rentals so that an owner of an apartment will receive a reasonable return on his investment and thereby be able to pay a fair share of the required municipal revenues.
Over the years, since the lack of adequate housing became a dominating problem, legislative authority has accepted the responsibility for providing solutions. It would extend this opinion beyond reasonable limits to attempt even an enumeration of the legislative solutions that have been adopted for executive action to relieve the growing housing emergency, all of which, with few exceptions, received judicial approval. See, e.g., N.J.S.A. 2A:33-1, 2 as amended (abolishing distraint for rent); N.J.S.A. 2A:39-1, 2, 6, 8, as amended (abolishing forcible entry and detainer); N.J.S.A. 46:8-19 et seq., as amended (providing for interest on security deposits); N.J.S.A. 2A:42-85 et seq. (providing for deposit of rents into court); N.J.S.A. 2A:42-10.10 (prohibiting retaliatory evictions).
Now we are confronted, as exemplified in this case, with the judicial determination of the extent to which government, by local legislation, can provide by ordinance for the right of tenants to continue the occupany of dwelling units during a period of serious housing shortage after their contractual right to do so has expired. Scholars have defined the issue in very simple form  does our system of government recognize a right to shelter?
Every human being has a right to be housed. And to some degree, he has a continuing right not to be uprooted annually. At least, such a person should have some area for participation in this annual procedure of rent revisions.
Food, clothing and shelter are perhaps more fundamental to life than free speech, freedom of worship and other inalienable rights. But the Constitution expressly guarantees those freedoms without assuring the basics for survival  food, clothing and shelter. The simple answer, based on the *327 history of governments, would appear to be that freedom of speech, assembly and worship can only exist under free government and have been and are denied in governments that do not respect human freedom; whereas the right to food, clothing and shelter are not only inalienable rights, but rights that are essential to life itself. They do not, therefore, require constitutional affirmation. It has been argued for years that basic to all enumerated rights in the Constitution is the right to life; that the Constitution is a document for the living  not the dead.
One can detect a movement  perhaps erratic, but progressive  towards the constitutional right to be housed. And income shortage brought about by "rent gouging" should not be the basis for deprivation of that housing. As a landlord must provide housing in New Jersey that is fit for use, so should there be a basis for assuring a tenant of continuous shelter upon reasonable terms. It is an affront to the dignity of tenants to provide indecent housing.
And only by securing the right to decent housing will we hope to assist our elderly, our poor and our younger middle-income families with children of pre-school age or in early elementary grades. Our hope of keeping together children from economically and ethnically different areas rests in no small measure upon some assurances of the right to housing.
The salaries of young married couples are frequently at the low level. And the birth of a child soon requires an extra room and naturally a more costly apartment. And so many want to live where other young people reside. But the rent schedule takes them to the far edge of their budget. A no vacancy area sometimes needs supervision. We must be concerned with future living patterns.
Karl Marx believed that the impersonal economic forces determined every other item of life (moral, intellectual and religious). Engels, following Marx, taught that these economic forces, if left alone, would inevitably generate a classless society, one in which every man would be equal economically and politically to every other. These were grand *328 theories, but they were formulated without sufficient knowledge of human behavior. For it is as true that human beings shape economic forces as that economic forces shape human behavior.
In America we have learned that if economic forces are left alone, some human beings will use them to their own advantage. The Price Commission is one example of the need to protect the consumer from unfair employment of the economic laws of supply and demand. It is eminently reasonable.
Our "rent regulation law" is another such example. We are not saying here that landlords have no right to make a profit. We are saying that the needs and rights of the consumer must be protected from the impersonal laws of supply and demand and from those who would use them unfairly. In the boroughs involved, the bargaining strength of the parties is unequal. See Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 403-404 (1960); Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 554, 555 (1967).
No one has the right to increase meat prices 300%, even if some people will pay for it. For if this happened, many people could not eat meat. And it is no answer to say that the problem will go away if people eat less meat. The absence of price controls on the raw products allows the growers to get as much as they can. This is wrong if you are trying to regulate inflation.
By analogy, no one has the right to increase rents 300%, even if some people will pay. For if this happened, many people would have no place to live. The worst danger lies in our thinking that the universe works on impersonal natural laws and that these will support us without our help  without any contribution by the human spirit. The same error has often been made in the economic realm. The impersonal laws of supply and demand were once thought to guarantee human prosperity if only we left them alone.
What is wrong with such a world? Have we not found that human beings are not just means to profit? Hasn't government *329 again and again been forced to legislate that men be given a fair wage  just compensation  the right to life, liberty and happiness?
The government is reminding us that a man has a dignity  not merely a price, a human value  not merely a use value. And unless we remember this, a man will perish.
Similarly, with the right to shelter. Just as man is entitled to his life, to his free pursuit of happiness, so he is entitled to a roof over his head. And if the unregulated laws of supply and demand decree that dwellings should skyrocket in price, leaving human beings without homes, then these laws must be regulated. But this is not to be done at the expense of other human beings. For it is as unjust to reduce owners to mere means as to dehumanize tenants. The right to shelter is consistent with the right to fair profit.
That tenants are no longer silent, complacent members of our society, unaware of their rights and powers, is now firmly established. It is ludicrous to imply that any segment of our society  tenants or otherwise  should continue to be uninformed as to its privileges. That tenant groups have developed a militancy of their own is not to be condemned. This type of tenant organization is similar to the explosive development of class actions which are encouraged and approved, throwing more and more issues into the courts. Kugler v. Romain, 58 N.J. 522 (1971); Crescent Pk. Tenants Ass'n v. Realty Eq. Corp. of New York, 58 N.J. 98 (1971); Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2 Cir.1968); In re Antibiotic Antitrust Actions, 333 F. Supp. 267 (S.D.N.Y. 1971). The voices of such a group and that of the property owners should not be stilled.
These prerogatives always presuppose lawful action to attain one's goal. The effort must be  and it has been  circumscribed by limitations of decisional, statutory and constitutional law. The apartment owners really contend that the constitutionality of the rent leveling ordinance is the *330 tenants' hope and the landlords' fear. This concern of hope and fear is needless and unwise. This is not Armageddon.
Perhaps the tenants will not win in this constitutional challenge. Perhaps the turning wheel of the police power will not stop at rent control. But someone must speak for a membership inarticulate in the law. And the sole question is whether this ordinance, which speaks for the rights of this group  rich, middle class and slum tenants alike  can pass constitutional muster. The ordinances cannot be faulted for over-exclusiveness or under-exclusiveness.
Unless we fight to preserve the human dignity of tenant and owner alike, the future existence of either becomes a real question. And so we can only support a fair and equitable regulation of rents for the future benefit of both sides.
The judicial imagination, the police power, and the right to shelter should go to greater lengths than ever before in extending the constitutional umbrella over the dignity of a regulated landlord-tenant relationship.
I am persuaded that where a crisis in housing exists which requires broad powers of rent control, in the interest of protecting public health, safety and general welfare, local government has the right to control and regulate the rental of available houses in those respects that are local in nature and which do not infringe on state or federal authority.
The temporary restraints heretofore granted are dissolved. The two ordinances are constitutional.
NOTES
[1] Section 11 of the Fort Lee ordinance refers to the board as the "Land Leveling Board." The court considers this a typographical error.
[1a] 1970 Census of Housing, Advance Report H.E.W. 11.