123 N.J. Super. 87 (1973)
301 A.2d 484
APARTMENT HOUSE COUNCIL, AN AFFILIATE OF THE NEW JERSEY BUILDERS ASSOC., A CORPORATION OF THE STATE OF NEW JERSEY, AND ROBERT RODRIGUEZ, PLAINTIFFS,
v.
MAYOR AND COUNCIL OF THE BOROUGH OF RIDGEFIELD, THE BOROUGH OF RIDGEFIELD, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, THE DEPARTMENT OF HEALTH OF THE BOROUGH OF RIDGEFIELD, AND THE RIDGEFIELD MULTIPLE DWELLING EMERGENCY COMMISSION, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided February 27, 1973.
*89 Mr. Richard W. Kracht for plaintiffs Apartment House Council and Robert Rodriguez (Messrs. Hutt and Berkow, attorneys; Mr. Richard W. Kracht on the brief).
Mr. Michael L. Scherby for defendants Mayor, Council, and Department of Health of the Borough of Ridgefield and The Ridgefield Multiple Dwelling Emergency Commission.
Mr. Steven Helterman, amicus curiae, for the State Office of Legal Services and the Legal Services Housing Task Force (Messrs. Steven Helterman, Gerard J. Clark, Richard E. Blumberg and Ms. Delores Mastro on the brief).
PASHMAN, A.J.S.C.
Plaintiff Apartment House Council is a New Jersey corporation consisting of builders who own and operate apartments, as does plaintiff Rodriguez in the defendant Borough of Ridgefield.
Plaintiffs challenge the constitutionality of a 1972 ordinance of said borough which requires owners of multiple dwellings to post security with a Multiple Dwelling Emergency Commission (hereinafter Commission) established for this purpose. The Commission is empowered to expend monies from the fund thus collected for purposes of repairs in apartments where the landlord, after 24 hours' notice, has failed to correct defective "emergency" conditions.
*90 Neither party alleges that there exists any genuine dispute as to the material facts. Accordingly, the matter is ripe for summary judgment under R. 4:46 and R. 4:67.
The ordinance provides for Commission action, after proper notice to the landlord, when "emergency conditions" exist, as determined by that Commission, including:
(1) Lack of adequate ventilation or light;
(2) Lack of adequate and properly functioning sanitary facilities;
(3) Lack of adequate and healthful water supply;
(4) Structural, mechanical or electrical defects which increase the hazards of fire, accident or other calamity;
(5) Lack of adequate heat during specified months and specified times of the day.
The ordinance is challenged on the following grounds:
(1) There is no statutory authority permitting the defendant borough to adopt the ordinance and that there is no need for such an ordinance to protect the public health, safety and welfare of the community;
(2) The ordinance fails to provide for a hearing to determine the existence of an emergency and its cause;
(3) The Commission alone is the enforcing body with no right of appeal from its decision, and
(4) The ordinance places an unreasonable burden on landlords in order to comply with its requirements.

I. STATUTORY AUTHORITY
The challenged ordinance states that it is authorized pursuant to the general grant of power to municipalities set forth in N.J.S.A. 40:48-2, which provides as follows:
Any municipality may make, amend, repeal and enforce such other ordinances, regulations, rules and by-laws not contrary to the laws of this state or of the United States, as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants, and as may be necessary *91 to carry into effect the powers and duties conferred and imposed by this subtitle, or by any law. [Emphasis added]
Plaintiffs contend that the ordinance can be valid only if there was a need for it in order to protect the general public welfare. Such a reading of N.J.S.A. 40:48-2 ignores the last phrase as emphasized above. The municipality may act whenever necessary to carry into effect the powers and duties conferred by state law.
We have in the present case an example of a municipality which has utilized this legislative authorization precisely as intended. As plaintiffs have acknowledged, N.J.S.A. 2A:42-74 et seq. is a statutory authorization to municipalities to protect inhabitants of multiple dwellings which have deteriorated through landlord neglect to a point at which local officials may deem the dwellings substandard. These sections are designed as a means to allow municipalities to ensure that multiple dwellings adhere to minimum standards of safety and sanitation. This "minimum standards" legislation was the starting point for the right of municipalities to enact ordinances aimed at shoring up substandard and otherwise defective housing. The ordinance in question should be considered on the same level as any ordinance enacted pursuant to this "minimum standards" legislation. It is a municipal expression of compliance with the Legislature's desire to allow such local control over housing problems which are essentially local in concern and thus should be local in solution. See various observations in Inganamort v. Fort Lee, 120 N.J. Super. 286 (1972).
It should be noted parenthetically at this point that there is no issue in this case of preemption by the State Legislature of the field of substandard housing. The Supreme Court of New Jersey decided the issue of preemption in Summer v. Teaneck, 53 N.J. 548 (1969). Chief Justice Weintraub articulated the rule to be as follows:
It is not enough that the Legislature has legislated upon the subject, for the question is whether the Legislature intended its action *92 to preclude the exercise of the delegated police power. * * * The ultimate question is whether * * * it can be said with confidence that the Legislature intended to immobilize the municipalities from dealing with local aspects otherwise within their power to act. [at 554-555]
Such is clearly not the case in the matter before us. There is here a clear legislative intent that the local police power shall not be impaired by any provision of the "minimum standards" legislation. N.J.S.A. 2A:42-84 states as follows:
Nothing in this act shall be construed to abrogate or impair the powers of the courts or of any department of any municipality to enforce any provisions of its charter or its ordinances or regulations, nor to prevent or punish violations thereof; and the powers conferred by this act shall be in addition and supplemental to the powers conferred by any other law.
Furthermore, there is another statutory expression of the Legislature's specific grant of authority to municipalities to regulate in the field of substandard housing and here, too, it is indicated that preempton was not intended. In N.J.S.A. 40:48-2.11, there is found the identical wording to that in N.J.S.A. 2A:42-84. The former section is part of N.J.S.A. 40:48-2.3 et seq., which is an act concerning the police power as it relates to unfit buildings. A statement of the extent of the power conferred by this act appears in N.J.S.A. 40:48-2.12a:
The governing body of any municipality may make, amend, repeal and enforce ordinances to regulate buildings and structures and their use and occupation to prevent and abate conditions therein harmful to the health and safety of the occupants of said buildings and structures and the general public in the municipality. [L. 1962, c. 66, § 1]
Other provisions of the act set forth procedures whereby municipalities may undertake to exercise its police power and abate conditions which are harmful to health and safety. However, as noted, these procedures were meant to supplement, not supersede, any measures which the municipality *93 might choose to take pursuant to its exercise of police power or under any other law. N.J.S.A. 40:48-2.11.
Thus, it is clear that we are dealing not with a preempted subject matter, that of inadequate housing, but rather with an area in which there are clear legislative mandates to the municipalities to act.
Further, the ordinance is in keeping with reasoning set forth by the Supreme Court in New Jersey Builders Ass'n v. East Brunswick Tp., 60 N.J. 222 (1972). An ordinance in that case sought to regulate building contractors by imposing upon them the requirement of posting a bond. The court struck down the ordinance for vagueness, yet it upheld the concept of a municipality's valid interest in imposing controls on an industry which so vitally affects the general welfare of local inhabitants. Justice Mountain, speaking for the court, held that so long as the standards and procedures are reasonably imposed and clearly set forth,
* * * [w]e see no reason, as an abstract proposition, why a municipality, as well as the State, may not employ a bond requirement as an appropriate means of pursuing its effort, directed in the public interest, to regulate and supervise building contractors. [at 231]
The court reasoned thus even without a specific legislative mandate such as that which is present in the case at bar. Clearly, therefore, both in the interest of the general welfare and as the implementation of the Legislature's will, the ordinance cannot fall for want of statutory authority.
But if it is assumed that there is no delegation of authority by statute, I believe that the inherent police power of Ridgefield permits this legislation. A municipal corporation is a government created by the Legislature. It possesses enumerated powers only and therefore it must act within the bounds of its delegated authority. N.J. Const. (1947), Art. IV, § VII, par. 11, declares that laws concerning municipal corporations should be liberally construed in their *94 favor and shall include not only powers expressly granted but also those which are necessary or incidental to the powers conferred.
The history of the police power is a story of growth. And with this economic growth there are increasing restraints upon property rights. The police power must include a vast reservoir.
And not only are the rent control features of N.J.S.A. 2A:42-74, approved in 1966, an exercise in liberalized relations between landlord and tenant, but N.J.S.A. 2A:42-85 pertaining to actions for maintenance of safe and sanitary housing, approved in 1971, clearly has pointed up the philosophy of the Legislature in permitting tenants to deposit their rents until such dwelling units satisfy minimum standards of safety and sanitation.
The delegated powers and the general police powers clearly warrant the conclusion that no preemption was carried out and that the Legislature did not intend to prohibit such regulation over multiple housing facilities as is contemplated in this ordinance.
Neither statute concerns itself with the "emergency conditions," as defined in section VI-B of the ordinance. The situations included in "emergency conditions" must be injurious to health or safety of the occupants of the building which arise out of stated circumstances. These conditions apply to ventilation, light, sanitary facilities, water supply, electrical facilities which increase fire hazards, and heat. The conditions must pose an immediate threat.
Property rights must serve human values and must be limited by those same values. Social enlightenment cries out for a more meaningful relationship between landlord and tenant. It is no comfort to a tenant, with the emergencies stated, to pay rent into court or even have rent controlled under the statute.
With more than one-third of our population living in apartments and other rental housing and one's home being the heart of privacy in America, the law cannot be so helpless *95 that an immediate effort could not be made in the interest of proper and safe shelter. The dignity of every human being demands a right to be housed. It is an affront to the dignity of that human to provide indecent housing even for a short spell. And that right presupposes continued habitation without being uprooted. Any plan which implements that understanding and does not constitutionally interfere with one's property rights as I have envisioned them, should be legally acceptable.
Provisions in this ordinance for correcting failures creating emergency situations posing an immediate threat to health and safety are constitutional. If it is lawful for a landlord to demand and receive from a tenant security for the faithful performance of the tenant's lease, it is equally lawful for the landlord to post some security for the faithful performance of the landlord's obligations under the lease. The arrangement is equitable. The dignity of tenant and landlord alike will be enhanced.

II. HEARING
Another proposed ground for striking down the ordinance is its alleged failure to allow a hearing prior to action by the Commission. While, as originally drafted, the ordinance contained no mention of a hearing, such an omission would not be a sufficient basis for striking down an otherwise constitutionally sound ordinance. The United States Supreme Court has held that due process requires a hearing before a deprivation of property can occur. Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Yet, as the court therein observed,
* * * due process tolerates variances in the form of a hearing "appropriate to the nature of the case," Mullane v. Centrol Hanover Tr. Co., 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 [1950] * * * and "depending upon the importance of the interests involved and the nature of the subsequent proceedings (if any)," Boddie v. Connecticut, 401 U.S. 371, 378, 91 S.Ct. 780, 28 L.Ed.2d 113 [1971] * * *. [Emphasis in original; at 1995]
*96 In the case at bar any situation in which the Commission would act must be, by definition, an emergency situation. In keeping, therefore, with the Fuentes language, any hearing regarding the expenditure of funds under this ordinance must be commensurate with the emergent nature of the circumstances.
As noted above, the ordinance is an implementation and extension of the "minimum standards" legislation, which includes the requirement that before rent controls may be imposed, the public officer (or one in charge of the condition of buildings) shall set a time and place for a due process hearing. N.J.S.A. 2A:42-77. I find that the provisions set forth therein shall be read so as to apply to and supersede any contrary provisions of the ordinance, but that any hearing to be held pursuant to the ordinance must by necessity be in keeping with the emergent nature of the circumstances. See Fuentes, supra.
Even without a specific grant of a hearing prior to determination that an emergency exists and that funds are to be expended to correct the situation, we could not fault this ordinance in a constitutional sense. When conditions exist such as those which the ordinance defines as "emergency conditions," it can be said that a public nuisance has been created. Indeed, the conditions listed in the ordinance, i.e., lack of adequate heat, various fire hazards, etc., can be found either particularly or within the language of N.J.S.A. 40:48-2.3, which sets forth the legislative findings and purposes in declaring that municipalities may act pursuant to their police power to abate conditions detrimental to the public health and safety in deficient housing:
It is hereby found and declared that the existence or occupation of any building or buildings, or parts thereof, in municipalities of this State which are so old, dilapidated or have become so out of repair as to be dangerous, unsafe, insanitary or otherwise unfit for human habitation, or occupancy, or use, are inimical to the welfare and dangerous and injurious to the health and safety of the people *97 of this State, and that a public necessity exists for the repair, closing or demolition of such building or buildings, or part thereof. Whenever any municipality of this State finds that there exists in such municipality any building or buildings which are unfit for human habitation or occupancy, or use, due to dilapidation, defects increasing the hazards of fire, accidents or other calamities, lack of ventilation, light or sanitation facilities, or due to other conditions rendering such building or buildings, or part thereof, unsafe or insanitary, or dangerous or detrimental to the health or safety or otherwise inimical to the welfare of the residents of said municipality, power is hereby conferred upon such municipality to exercise its police powers to repair, close or demolish, or cause or require the repairing, closing or demolition of such building or buildings, or part thereof, in the manner herein provided. [N.J.S.A. 40:48-2.3]
Again, it should be noted that "the manner herein provided" as per above, is supplemental to, and not in lieu of, the powers of municipal officers conferred by any other law. N.J.S.A. 40:48-2.11.
It takes no stretch of legal reasoning to realize that the conditions outlined in this statute constitute what has long been described as "public nuisance," a condition which has always been within the police power of localities to abate in a summary fashion. Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.ed. 385 (1894); Ajamian v. Twp. of N. Bergen, 103 N.J. Super. 61 (Law Div. 1968), aff'd 107 N.J. Super. 175 (App. Div. 1969), cert. den. 398 U.S. 952, 90 S.Ct. 1873, 26 L.Ed.2d 292 (1970)
Lawton concerned a New York statute authorizing the taking of certain fishing nets, which were declared a public nuisance. While the taking was not necessarily for health reasons, the principle of summary abatement remains the same, and the United States Supreme Court upheld the statute, stating as follows:
The extent and limits of what is known as the "police power" * * * is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. * * * [T]he state may interfere wherever the public interests demand it, and in this particular a large discretion is necessarily vested in the legislature to determine, not only what *98 the interests of the public require, but what measures are necessary for the protection of such interests. * * * The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations; in other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts. * * * [152 U.S. at 136-137, 14 S.Ct. at 500, 501 emphasis added]
The court then continued, after a discussion largely concerning the regulation of fishing rights, and upheld the statute although it authorized proceeding in a summary manner to abate the nuisance:
* * * [T]he summary abatement of nuisances without judicial process or proceeding was well known to the common law long prior to the adoption of the constitution, * * *.
Nor is a person whose property is seized under the act in question without his legal remedy. If, in fact, his property has been used in violation of the act, he has no just reason to complain; if not, he may replevy his nets from the officer seizing them, or, if they have been destroyed, may have his action for their value. In such cases the burden would be upon the defendant to prove a justification under the statute. * * * Indeed, it is scarcely possible that any actual injustice could be done in the practical administration of the act. [Id. at 142, 14 S.Ct. at 503]
It is clear that the summary destruction of fish nets is at best only remotely connected with the needs of inhabitants of inadequate housing, but the principle remains the same  that summary abatement of public nuisances is an old and accepted practice which passes constitutional muster. Any misapplication of this principle can be remedied in the courts, and a full due process hearing prior to action in an emergency situation is neither constitutionally required nor is it prudent from an environmental standpoint.
An old New Jersey case takes this same position. Manhattan Manufacturng and Fertilizing Co. v. Van Keuren, 23 N.J. Eq. 251 (Ch. 1872). The court therein stated:
At common law, it was always the right of a citizen, without official authority, to abate a public nuisance, and without waiting to *99 have it adjudged such by a legal tribunal. If he assumed to act upon his own adjudication that it was, and such adjudication was afterwards shown to be wrong, he was liable, as a wrongdoer, for his error, and appropriate damages could be recovered against him. This common law right still exists in full force. Any citizen, acting either as an individual or as a public official under the orders of local or municipal authorities, whether such orders be or be not in pursuance of special legislation or chartered provisions may abate what the common law deemed a public nuisance. In abating it property may be destroyed and the owner deprived of it without trial, without notice, and without compensation. Such destruction for the public safety or health is not a taking of private property for public use, without compensation or due process of law, in the sense of the Constitution. [at 255]
This language was quoted and restated in Ajamian v. North Bergen Tp., supra, in which the Superior Court, Law Division, upheld the right of the township, both under N.J.S.A. 40:48-2.3 and 2.11 and at common law, to order summarily the vacating of a building that was a public nuisance, and the township was not liable in damages to the owner. The court stated:
In City of Miami Beach v. Texas Co., 141 Fla. 616, 194 So. 368 (Sup. Ct. 1940), where an ordinance authorized health officials to condemn a building as unfit, it was held that the effect of the ordinance was to declare the building a public nuisance. * * * Thus, where article 13, section 4 of the North Bergen Sanitary Code authorizes the closing of a building as being "unfit for human habitation by reason of its being so infected with disease or by reason of its being in a condition dangerous to health or life or to be likely to cause sickness among the occupants," it, too, declares a building within its terms a public nuisance. Such abatement for public safety or health is not a taking of private property for public use without compensation or due process of law, in the sense of the Constitution. It is simply the prevention of its noxious and unlawful use and in that context the safety of the public is the paramount law. * * *
This is not to say that one whose property has been summarily taken, vacated or destroyed is not entitled to a hearing at some stage in the proceedings. * * *
By this action in lieu of prerogative writs, plaintiff is "calling upon" defendants, who vacated the property, "to account for the same." He has been afforded the opportunity in this court "to show that the alleged nuisance was not one in fact." Here he has had his hearing. [103 N.J. Super. at 74-76]
*100 Following this line of reasoning, it is clear to this court that the occurrence of any of the emergency conditions expressed in the Ridgefield ordinance would constitute what has long been termed a public nuisance. The municipality has the power, both under N.J.S.A. 40:48-2.3 and the common law, to abate such conditions by expenditure of money from the funds collected pursuant to the ordinance. N.J.S.A. 40:48-2.3 speaks in terms of the power of a municipality "to repair" or "cause or require the repairing" of defective housing conditions. As indicated earlier, this ordinance is an implementation of this mandate, as it is of the mandate of the "minimum standards" rent control statute, N.J.S.A. 2A:42-74 et seq. While our discussion of the "public nuisance" aspect of this case indicates that no due process hearing is required in public nuisance situations, the ordinance is supportable in the alternative by reading into the ordinance whatever due process safeguards are provided in these two acts, but modified according to the emergent nature of the circumstances. Fuentes v. Shevin, supra. If this modification requires, for the sake of quick action, that the hearing be held only after the money has already been expended, then this surely will satisfy any due process objection to the ordinance, since, as I have extensively indicated, it may be upheld without any hearing requirement at all on "public nuisance" grounds.
A third alternative theory on which to uphold this ordinance on due process grounds has been provided by the Borough of Ridgefield. An amendment to the ordinance has been adopted which provides for notice to the landlord "immediately" after expenditure of the amount necessary to bring his share of the fund up to the required amount within certain time limitations. It also provides for an appeal and hearing before the mayor and council as to whether an emergency actually did exist and whether the amount expended was reasonable. This is, of course, an advisable measure and further supports the validity of the ordinance from a due process standpoint. However, the ordinance, as the discussion *101 above amply demonstrates, does not stand or fall on this amendment alone.
The foregoing observations are underscored by the general statutory and constitutional mandate that there is a presumption of validity of municipal ordinances which are to be construed liberally in favor of upholding them. N.J. Const. (1947), Art. IV, § VII, par. 11. N.J.S.A. 40:42-4 provides as follows:
In construing the provisions of this subtitle, all courts shall construe the same most favorably to municipalities, it being the intention to give all municipalities to which this subtitle applies the fullest and most complete powers possible over the internal affairs of such municipalities for local self-government.
Pursuant to these mandates, it is my view that the ordinance is not invalid by reason of due process grounds.

III. DELEGATION OF AUTHORITY AND APPEAL
In challenging the ordinance's delegation of power to the Commission, plaintiffs point to the ruling of this court in Inganamort v. Fort Lee, supra. The court upheld the establishment of rent leveling boards which were to exercise an essentially advisory function, with approval of the governing body of the municipality required in order to take final action. This advisory capacity was specifically spelled out in the ordinances. Notwithstanding, the court held:
* * * Their advisory roles are mandated by the ordinances. The fact that the rules and regulations promulgated by the Boards are to have the force of law does not detract from that advisory character. Appeal to various governing bodies is always available. The courts provide a source of ultimate review. That is the case with any administrative body. [120 N.J. Super. at 304]
The same language is applicable to the case at bar, even though the Commission in this case may take action without prior approval of the governing body. In Inganamort there was no specific statutory grant of authority to municipalities *102 to do what was done by the localities in that case. They were acting primarily pursuant to the inherent police power of municipalities. Therefore, it was imperative that close and careful scrutiny by the governing body, which is the repository of the local police power, be maintained. In the case at bar, as I have indicated in other portions of this opinion, we are dealing not only with the inherent power of Ridgefield to act for the general welfare of its inhabitants, but we are dealing as well with a municipal implementation of the specific will of the Legislature as embodied in N.J.S.A. 2A:42-74 et seq. and N.J.S.A. 40:48-2.3 et seq. While the "public officer" envisioned in the legislation cannot take final action without prior approval of the governing body, this is not to say that by further implementing the "minimum standards" of adequate housing and expanding the scope of the legislation beyond rent controls as a device in this regard, it is at all improper to delegate responsibility for immediate action to a Commission. As I said in Inganamort, supra, and as I have said here today, there is always the avenue of appeal to the governing body and to the courts.
We must bear in mind that we are here concerned with emergency situations in which quick action is often necessary to effect immediate repairs. It is much more commensurate with equity and sound environmental judgment to allow the work to be done quickly and without delay, than to force a tenant with limited means into court before he gets action. It is better to do the work now, with responsibility falling upon the Commission, than to endure delays and protracted debate while awaiting approval of the governing body.
The ordinance in question is a proper delegation of authority to an administrative body.

IV. UNREASONABLE BURDEN ON LANDLORDS
Finally, plaintiffs contend that the requirement of posting security places an unreasonable burden on owners of *103 multiple dwellings. The schedule of required payments to the Board of Health is set forth in section III of the ordinance, as follows:
A. Where the owner owns between 4 and 25 dwelling units the owner shall deposit $100.00 for each dwelling unit.
B. Where the owner owns between 26 and 40 dwelling units, the owner shall deposit $2,500.00 for the first 25 units and $50.00 for each additional dwelling unit owned.
C. Where the owner owns more than 40 dwelling units, the owner shall deposit $2,500.00 for the first 25 units, $50.00 per unit for the next 15 units, and $30.00 per unit for each additional dwelling unit.
D. In no event shall an owner be required to deposit more than $5,000 in security funds pursuant to this ordinance * * *
The allegation that these requirements are unreasonable entirely misses the point of what the ordinance was designed to do. It was intended to take a step toward equalizing the relative positions of bargaining power of landlord and tenant. The ordinance was designed to establish a counterpart to the requirement that tenants post a security deposit upon occupying an apartment.
The security deposit, like that required of tenants, will ensure that when an emergency repair is needed, the money required to do the job properly will be there. The landlord who complains that he is unable to post the security proves the point he is trying to challenge; he will be equally as unable to correct an emergency defective condition should the occasion present itself. The ordinance requires the landlord, after a fashion, to insure himself to raise the money now, before an emergency arises, so that the money is there when needed. It is unrealistic to contend that this is an unreasonable burden, when the landlord, in the long run, is a beneficiary.
The Ridgefield ordinance is constitutional and effective immediately.