216 N.J. Super. 434 (1987)
524 A.2d 416
JEANETTE MATICKA, ET AL., PLAINTIFFS-APPELLANTS,
v.
THE CITY OF ATLANTIC CITY, ET AL., DEFENDANTS-RESPONDENTS, AND STATE OF NEW JERSEY, DEPARTMENT OF HUMAN SERVICES, ET AL., DEFENDANTS AND THIRD-PARTY DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 28, 1986.
Decided February 3, 1987.
*437 Before Judges PRESSLER, BAIME and ASHBEY.
David G. Sciarra, Assistant Deputy Public Advocate, argued the cause for appellants (Alfred A. Slocum, Public Advocate of New Jersey, attorney; David G. Sciarra and Susan Remis Silver, Assistant Deputy Public Advocate, on the brief).
Dorothy Donnelly, Deputy Attorney General, argued the cause for respondent State of New Jersey, (W. Cary Edwards, Attorney General of New Jersey, attorney; James J. Ciancia, Deputy Attorney General, of counsel; Dorothy Donnelly, on the brief).
*438 Joseph E. Kane, Assistant County Counsel, argued the cause for respondent County of Atlantic (John R. Armstrong, Acting County Counsel, attorney; Joseph E. Kane, on the brief).
Matthew H. Powals, City Solicitor, argued the cause for respondent City of Atlantic City.
Melville D. Miller, Jr. argued the cause for amicus curiae Legal Services of New Jersey (Melville D. Miller, Jr., attorney; J. Harris David, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
By this action, the Public Advocate challenges the validity of conditions placed both by regulation and administrative interpretation on the availability of emergency assistance to homeless families with dependent children, pursuant to N.J.A.C. 10:82-5.10(c).[1] He contends that the 90-day time limitation imposed by the regulation and the fault standard employed by the administering agency in applying the regulation separately and in conjunction contravene the enabling legislation. Our review of this record persuades us that despite its apparent extensiveness and comprehensiveness, it nevertheless constitutes an inadequate basis for evaluating the Public Advocate's contention. Accordingly, we remand to the Department of Human Services, Division of Welfare (Division), for a full evidential hearing to determine whether and to what extent *439 there are other available resources in this state affording relief to families with dependent children who are unable, within a reasonably brief period after being rendered homeless, to obtain new permanent housing.
In order properly to focus the factual background and legal issues involved in this controversy, we refer first to the challenged regulation. N.J.A.C. 10:82-5.10(c) authorizes emergency assistance for families with dependent children
[w]hen there has been substantial loss of shelter, food, clothing, or household furnishings by fire, flood or other similar natural disaster, or when, because of an emergent situation over which they had no control or opportunity to plan in advance, the eligible unit is in a state of homelessness and the county welfare agency determines that the providing of shelter and/or food and/or emergency clothing, and/or minimum essential house furnishings are necessary for health and safety....
Subparagraph (1) of that section, as amended effective June 1986, imposes a maximum 90-day time limitation on the grant of emergency assistance for shelter by restricting assistance to a "temporary period not to exceed two calendar months following the month in which the state of homelessness first becomes known to the county welfare agency." The Public Advocate's objection to (c)(1) is based directly on the 90-day limit itself, which, he claims, has proved in many cases to provide an insufficient time for the obtaining of new housing by displaced families. His objection to paragraph (c) is not textual but is rather based on the interpretation by the Division of the phrase "emergent situation over which they [the eligible family unit] had no control or opportunity to plan in advance." By its Public Welfare Instruction No. 85-9-1 issued on September 4, 1985, and purportedly codifying long-standing Division policy, the Division construed "emergency" as follows:

The terms "emergency" and "emergent" apply to occurrences which are sudden, unexpected and which require immediate attention. The intent of the regulation is to limit emergency assistance to occurrences in which all three criteria are present. The terms "control" and "opportunity to plan in advance" are interrelated and address the issue of whether, as in the event of a disaster, the eligible unit lacked sufficient forewarning of the event to enable the family to avoid the adverse consequences of the event. "Opportunity to plan in advance" is thus defined with respect to the length of time the *440 eligible unit had to plan for the emergency, and not with respect to the availability or existence of suitable or comparable alternative arrangements, e.g., shelter. The regulation is intended to meet the needs of those recipients upon whom extreme hardship has been imposed unavoidably and extends accordingly a limited degree of extra assistance, to be made available only in extraordinary circumstances. [Emphasis added].
Thus prior notice to a family of the imminence of loss of shelter is ipso facto deemed by the Division to constitute an adequate opportunity to plan which disqualifies it from eligibility for emergency assistance. Accordingly, families having prior notice of eviction by reason of code enforcement, condemnation or other cause are deemed ineligible for emergency assistance. It is apparently the Division's theory that by failing to use the opportunity afforded by the notice to obtain alternative shelter, the family itself is responsible for its ensuing homelessness. This is the "fault standard" challenged by the Public Advocate. The fundamental argument the Public Advocate makes is that the severe constraints placed on the availability of emergency assistance by both the time standard and the fault standard result in the contravention by the Division of the mandate and underlying policy of N.J.S.A. 44:10-1 et seq. (Assistance for Dependent Children), whose stated purposes are
(1) To provide for the care of eligible dependent children in their own homes or in the homes of relatives, under standards and conditions compatible with decency and health,
(2) To help maintain and strengthen family life,
(3) To help such parents or relatives to attain the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection, and
(4) To provide for the care of a dependent child whose parents have been denied assistance under the provisions of section 2. [N.J.S.A. 44:10-2] [N.J.S.A. 44:10-1(a); footnote omitted]
The Public Advocate's contention in its present contextual framework has reached us by a tortuous procedural and substantive route. The Public Advocate first filed this action in February 1984. The named individual plaintiffs were six homeless and indigent men and women for whom no emergency shelter was available in Atlantic City, who lacked the means of obtaining shelter, and who therefore attempted to survive on *441 the streets of Atlantic City or under its boardwalk or in abandoned buildings. The gravamen of that complaint was that the City, by not providing emergency shelter for its indigent homeless, was violating obligations imposed upon it by the General Public Assistance Law, N.J.S.A. 44:8-107, et seq.
By way of interim relief, the court ordered the City "immediately to take such steps as are reasonably necessary to provide eligible persons with emergency shelter and immediate assistance as required by the Public Assistance Law and the appropriate applicable regulations." The court also granted leave to the City to file a third-party complaint against the New Jersey Department of Human Services, its Commission, and Atlantic County. That complaint, filed in April 1984, alleged that the Department had improperly failed to reimburse the City for 75% of its general assistance expenditures and that it had failed to ensure the compliance by neighboring municipalities of their respective general assistance obligations. It also alleged that although the County had, by its Department of Social Services, established a County Coordinated Emergency Assistance Network pursuant to the recommendations of the 1983 report of the Governor's Task Force on the Homeless, it had nevertheless failed either to adopt or implement the recommended regional approach to homelessness.
The litigation proceeded, and in January 1985 the trial judge entered an order adjudicating Atlantic City's obligation to provide emergency shelters for the homeless and directing the City to prepare "a comprehensive plan for the provision of safe and suitable emergency shelter and other immediate assistance (emergency shelter services) to homeless and needy persons in Atlantic City." In compliance with the order, the City ultimately prepared a comprehensive plan which it filed with the court in December 1985. The Public Advocate was thereafter granted leave to file an amended complaint alleging direct claims against the Department of Human Services and Atlantic County. The amended complaint, filed in April 1986, focused upon homeless families and asserted the standing of the Public *442 Advocate to sue in a representative capacity on their behalf. Insofar as the issues here are concerned, it was the allegation of the Public Advocate that the Department of Human Services and the County had failed to comply with the dictates of the state constitution and state and federal law by not having made adequate provision for the assistance of homeless families. The amended complaint also specifically challenged N.J.A.C. 10:82-5.10 as violative of state and federal law.
The response of the Department and the County to the amended complaint was a motion for summary judgment dismissing the newly added claims. The Public Advocate and the City cross-moved for summary judgment declaring a state constitutional right to shelter and invalidating the fault and time standards of the disputed regulation. Early in July 1986 the trial court granted the State and County motion in respect of the constitutional claim and dismissed that count of the amended complaint. Decision was, however, reserved on the other issues. Within several days thereafter, on July 11, 1986, the Public Advocate sought emergent relief from the trial court by way of an order requiring the Department and the County to afford emergency assistance to a group of families facing imminent homelessness. To a significant extent, the present posture of this litigation derives from that application and the proceedings both in the trial court and in this court which followed.
The occasion of the July 1986 emergency was as follows. During the pendency of the litigation, the City had voluntarily undertaken to pay for emergency motel housing for families with dependent children who had either been denied emergency assistance by the County or who had qualified for emergency assistance but had failed to find substitute housing within the time limit of the regulation. On July 7, 1986, a City representative advised the Public Advocate that, having spent over a million dollars to provide for the homeless families referred back to it by the County as either ineligible for emergency assistance or ineligible for continued assistance, the City had *443 exhausted all of the funds available to it by grant or appropriation. Consequently, it was forced to advise these families that they would have to vacate their motel rooms by August 11, 1986. In further support of his emergent application, the Public Advocate relied on the affidavits of seven single-parent women who were receiving AFDC assistance; who had either been declared ineligible for emergency assistance or had exhausted the time limitation; who had among them a total of nineteen children ranging in age from 3 months to 12 years; who were living in motel rooms paid for by the City; and who had been unable by their own efforts or with the assistance of others to find substitute housing for the homes they had lost by fire, code enforcement, condemnation, or eviction for other cause. While the temporary motel accommodation in all cases was unsatisfactory, it was all that protected them and their children from a total lack of shelter.
In denying the application for emergent relief, the trial judge recognized that while the homeless families who were about to lose their motel shelter would suffer irreparable harm, he was without power to direct governmental entities with respect to the allocation of their resources. He further concluded that the essence of the reserved issues raised by the amended complaint was the challenge to the validity of the limitations imposed by the emergency assistance regulation on the availability of that relief. That challenge, he concluded, and correctly so, is one required by R. 2:2-3(a)(2) to be brought in the first instance in the Appellate Division. Accordingly, he entered an order on August 15, 1986, pursuant to R. 1:13-4, transferring to this court that portion of the amended complaint attacking the regulation. We then entered an order accelerating these proceedings, which we and all parties view as limited to the issue of whether the regulation violates state and federal statute.
In October 1986 the Public Advocate applied to us for emergent relief on behalf of six families faced with imminent homelessness, only one of which was among the original group which *444 was the subject of the August application. The then current situation in Atlantic City in respect of homeless families was described by the supporting affidavits of Kenneth Wright, the City's relocation officer, and Helen Seitz, the acting supervisor of the Homelessness Prevention Program in the New Jersey Department of Community Affairs (DCA). Wright explained that in August when the city was forced by fiscal constraint to terminate its voluntary program of assistance for homeless families who had been declared ineligible for emergency assistance by the County or who had exhausted the time limit of the emergency assistance regulation, DCA voluntarily undertook to assist the 57 homeless families then residing in motels at City expense. DCA provided field workers and rental assistance, enabling Wright to find permanent housing for all but six families, for whom DCA continued to pay motel expenses. According to Seitz, the Homelessness Prevention Program does not by its terms extend to homelessness caused by "condemnation through housing code enforcement, a chronic inability to pay rents, or an inability to locate affordable housing." Nevertheless, assistance was extended to the Atlantic City families on an emergency basis because of the impending crisis resultant from the City's termination of assistance on August 11th. Although it had been anticipated that DCA would simply continue motel costs for an additional two weeks during which it would assist these families in finding permanent housing, it found at the end of that period that
a number of families were still in the motels and without any place to go. My department decided that we could only continue to shelter those families who were in the motels due to code enforcement activity, and we had to terminate those families who were discontinued from the emergency assistance component of the AFDC Program. Again, DCA had no statutory obligation to shelter the code enforcement families but did so voluntarily. Similarly, it was extraordinary for DCA to take this step to pay for the families' shelter costs, and I know of no other instance where DCA took similar action.
Seitz also asserted that
Based on my work with the homeless families at the motels, it is my understanding that the Atlantic County Welfare Agency has not taken any meaningful steps to help the homeless families find permanent housing. Rather, it was *445 only through DCA's intensive casework and counseling that a number of homeless families in the motels were able to find alternative living arrangements.
It was her further observation that
the City of Atlantic City cannot pay for the shelter costs of those homeless families who remain in the motels because they have run out of money that was designated for that purpose.
It is also my understanding that neither the County of Atlantic nor the New Jersey Department of Human Services (DHS) would shelter these families due to the operation of the DHS agency assistance regulations which establish strict requirements, commonly called the "fault standard" and a 60-90 day maximum emergency assistance time limit.
Therefore, if not for the DCA's intervention and assistance, the homeless families who are now in the motels would otherwise be out in the streets.
Finally, she concluded,
Unfortunately, the homeless families in the motels are still in a bad predicament because the DCA could decide, at any moment and without notice, to terminate its voluntary shelter payment program.
At this point of time, it is unclear how long the DCA will continue to pay for their shelter costs. DCA is presently operating on a day to day basis and has made no commitment to continue providing for these homeless families.
Seitz's affidavit was signed on September 24, 1986. Her caution respecting the imminent termination of DCA's voluntary undertaking was realized on October 10, 1986, when she advised Wright that DCA would not pay the motel bills of the remaining families after October 15, 1986. Accordingly, Wright instructed them to seek emergency assistance under the regulation from the County. The County, however, denied each of the applications on the ground that each had, during the period of assistance from the City and DCA, an opportunity to plan, "rendering each of them ineligible." Faced, therefore, with the prospect of what was then six families with dependent children being forced onto the streets, the Public Advocate sought emergent relief from this court, and we entered an order requiring the County to grant these families emergency assistance pending appeal. We were advised at oral argument that as of that date there remained four families receiving emergency assistance under that order.
In addressing the attack of the Public Advocate on the fault and time standards of the emergency assistance regulation, we *446 must first consider that regulation in the light of its statutory framework. In brief, the emergency assistance program in this state derives from federal legislation establishing the matching AFDC program. 42 U.S.C.A. § 606. Emergency assistance is provided for by 42 U.S.C.A. § 606(e), which leaves to those states opting to participate in the AFDC program the further option of participating in the AFDC emergency assistance program, the stated purpose of which is to avoid the destitution of a child and to "provide living arrangements in a home for such child." New Jersey opted to participate in the AFDC program by its 1959 enactment of N.J.S.A. 44:10-1, et seq. Its option to participate in the emergency assistance program was, as is authorized by federal legislation, exercised by the Commissioner of the Department of Human Services by the promulgation of a state plan approved by federal authorities. The heart of the state plan is the challenged regulation. The Department takes the position that the state plan need not be as expansive as the federal enabling legislation. See Quern v. Mandley, 436 U.S. 725, 98 S.Ct. 2068, 56 L.Ed.2d 658 (1978). Accordingly, it acted on its own initiative rather than by federal requirement in including the "opportunity to plan" limitation of the regulation. We are advised that in respect of the time limitation, 90 days is the maximum period for assistance which federal authorities have thus far approved in state plans, but we are not advised that any state proposal for a longer period has been rejected by federal authorities.
Although emergency assistance is not provided for by the AFDC state enabling legislation, it is nevertheless a component of the overall plan of assistance for dependent children embodied by that legislation. Hence, the Public Advocate argues, the validity of the emergency assistance regulation must be tested by the AFDC statute. We agree with this proposition, as do all of the parties. The nub of the dispute is whether the time and fault standards imposed by the Department do indeed violate the policy, purpose and provision of N.J.S.A. 44:10-1, et seq. The Public Advocate's argument is, basically, *447 that the withholding of emergency assistance from families under both the fault and the time standards renders them homeless, and homelessness is the antithesis of each of the purposes of the AFDC program as stated by N.J.S.A. 44:10-1(a). The Public Advocate also points out that the typical consequence of homelessness of families with dependent children is the separation of the family and the placement of the children in foster care under the custody of the Division of Youth and Family Services. As explained by the amicus curiae:
According to the Administrative Office of the Courts, housing problems resulted in 1,211 children in New Jersey receiving placement in foster care in 1983 alone. New Jersey Judiciary 1983 Report on Child Placement Review, Administrative Office of the Courts at 82. Indeed, the Division of Youth and Family Services reports that homelessness and extreme housing difficulties represent the # 1 reason why children are placed in foster care. Children Entering Foster Care: Factors Leading to Placement (Summary Report), Division of Youth and Family Services, Bureau of Research, Evaluation and Quality Assurance, at 4 (January 1985).[2]
The position taken by the City is that homelessness is not a problem which can be effectively resolved by municipalities and, hence, that broad-based resolution must come from state or regional action. The Department and the County recognize the personal and societal catastrophe of homelessness but defend the regulation as an appropriate allocation of available fiscal resources. See, e.g., Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).
In considering these contentions, we start with the self-evident proposition that a civilized society cannot tolerate the homelessness of those of its members who are too impoverished to provide shelter for themselves. We doubt, moreover, that there is any proposition currently affecting the welfare of our citizenry which has received more intense and sympathetic attention from every branch of government or which represents *448 a more compelling public policy of this state. The recent focus on homelessness by the executive branch began with the appointment by Governor Kean of a Task Force on the Homeless, whose 1983 and 1985 reports not only describe the problem and ascribe its root causes but also present blueprints for action by all levels and resources of government. Governor Kean, in accepting the first report and making his own recommendations for legislative and executive action, expressly endorsed the Task Force's premise that "all persons, regardless of fault, are entitled to the basic human needs for shelter and food and it is the obligation of government to ensure that these needs are met." It was his further pledge that
While that obligation shall remain permanent in the sense that one of the most basic functions of government is to provide help for those who cannot help themselves, our long term goal must be restoring those individuals to a meaningful and productive place in our communities.
See Report of the Governor's Task Force on the Homeless, October 1985 at 69.
The Legislature has for decades recognized the problems of low-income families and particularly their housing problems and has over the years enacted a series of remedial acts designed to ameliorate the consequences not only of destitution generally but of a housing market in which the poor and increasingly, persons of moderate incomes as well, cannot compete for safe, sanitary, and decent shelter. In each of these enactments, the Legislature has reiterated not only its recognition of these problems but also its commitment, as a matter of public policy of the first magnitude, to address them constructively, responsively, and with the provision of necessary financial assistance. See, e.g., N.J.S.A. 55:14A-1, et seq.; N.J.S.A. 55:14A-2 (Local Housing Authorities Law of 1938); N.J.S.A. 55:14B-1, et seq.; N.J.S.A. 55:14B-2 (Housing Co-Operation Law of 1938); N.J.S.A. 55:14D-1, et seq.; N.J.S.A. 55:14D-2 (Redevelopment Companies Law of 1944); N.J.S.A. 55:14E-1, et seq. (Urban Redevelopment Law of 1946); N.J.S.A. 55:14F-1, et seq. (Municipal Housing Law of 1946); N.J.S.A. 55:14G-1, et seq. (Veterans' Housing Law of 1946); N.J.S.A. 55:14H-1, et seq.; N.J.S.A. 55:14H-2 *449 (State Housing Law of 1949); N.J.S.A. 55:141-1, et seq., N.J.S.A. 55:141-2 (Senior Citizens Nonprofit Rental Housing Tax Law of 1965); N.J.S.A. 55:14J-2.1, et seq. (Moderate Income Housing Law of 1978); N.J.S.A. 55:14K-1, et seq.; N.J.S.A. 55:14K-2 (New Jersey Housing and Mortgage Financing Agency Law of 1983); N.J.S.A. 55:15-1, et seq.; N.J.S.A. 55:15-3 (Public Housing Law of 1933); N.J.S.A. 55:16-1, et seq., N.J.S.A. 55:16-2 (Limited-Dividend Housing Corporations Law of 1949); N.J.S.A. 20:4-1, et seq.; N.J.S.A. 20:4-2 (Relocation Assistance Act of 1971). More recently, and in direct response to executive recommendations, the Legislature has enacted the Prevention of Homelessness Act (1984), N.J.S.A. 52:27D-280, et seq. and the act providing for Emergency Shelters for the Homeless (1985), N.J.S.A. 55:13C-1. Illustrative of the Legislature's continued dedication to alleviation of homelessness are its statements that "[i]t is the longstanding policy of this State that no person should suffer unnecessarily from cold or hunger, or be deprived of shelter" and that "[i]t is a matter of urgent public concern that safe and habitable shelter be available at all times to all residents of the State, and that governmental procedures be expedited if this shelter is to be provided." N.J.S.A. 52:27D-281(a) and N.J.S.A. 55:13C-1(c), respectively. Finally, the Fair Housing Act (1985), N.J.S.A. 52:27D-301, et seq., responsive to the concerns expressed in South Burlington County NAACP v. Mount Laurel, 67 N.J. 151 (1975), and South Burlington County NAACP v. Mount Laurel, 92 N.J. 158 (1983), recognizes the need for state intervention in providing adequate and affordable housing for all citizens.
Nor has the judiciary been insensitive to the essential governmental obligation to respond to homelessness. See, e.g., Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp., 80 N.J. 6, 22 (1976), app. dism. 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977) (explaining that "[i]n fact, not only do housing needs fall within the purview of the `general welfare,' but they have been recognized as `basic' by this Court."); Oakwood at Madison, *450 Inc. v. Township of Madison, 72 N.J. 481, 534 (1977) (recognizing the "governmental-sociological-economic enterprise of seeing to the provision and allocation throughout appropriate regions of adequate and suitable housing for all categories of the population...."); DeSimone v. Greater Englewood Housing Corp. No. 1, 56 N.J. 428, 436 (1970) (noting that the critical housing situation there addressed "cries out for the active and continuous exercise of the highest citizenship by all segments of the population and all governmental bodies."); New Jersey Mortgage Finance Agency v. McCrane, 56 N.J. 414, 420 (1970) (noting that "[t]he question of whether a citizenry has adequate and sufficient housing is certainly one of the prime considerations in assessing the general health and welfare of that body."); Apartment House Council v. Mayor & Council of Ridgefield, 123 N.J. Super. 87, 94-95 (Law Div. 1973) (noting that "the law cannot be so helpless that an immediate effort could not be made in the interest of proper and safe shelter. The dignity of every human being demands a right to be housed. It is an affront to the dignity of that human to provide indecent housing even for a short spell. And that right presupposes continued habitation without being uprooted."); Molino v. Mayor and Council of Bor. of Glassboro, 116 N.J. Super. 195, 204 (Law Div. 1971) (stating that "`as a matter of law in the light of public policy and the law of the land' ... housing needs must be met by official action."). And see St. John's Evangelical Lutheran Church v. Hoboken, 195 N.J. Super. 414, 420-421 (Law Div. 1983).
Thus all three branches of government have concurred in the principle that the prevention of homelessness is a necessary governmental function, at least when all private resources have proved unavailing. The question then is simply whether the potential scope of the answer to the homelessness problem which could be available under the emergency assistance program *451 of 42 U.S.C.A. § 606(e) and N.J.A.C. 10:82-5.10(c) has been unduly constricted by the Department.[3]
With respect to the so-called fault standard, we have no difficulty in approving the condition of "opportunity to plan" contained in the regulation. Semantically, that phrase is simply a definition of a non-emergency. What we find, however, to be enormously troubling is the interpretation of the Department which equates opportunity to plan with advance warning of the crisis. In view of the well-understood and well-documented lack of affordable housing for the poor,[4] we are convinced that it is ultimately unrealistic and therefore arbitrary and unreasonable for "opportunity to plan" to be defined exclusively in terms of notice. We further point out that the regulation speaks not only to opportunity to plan but also, in the disjunctive, to an emergent situation beyond the family's control.[5] Thus, the precise text of the regulation refers to a state of homelessness which results from "an emergent situation over *452 which they had no control or opportunity to plan in advance." Eviction because of code enforcement or a declaration that the dwelling is unfit for habitation is certainly an emergent situation over which the displaced family has no control. Beyond that, there is no meaningful opportunity to plan in advance if, considering the economic means of the family and the availability of affordable alternative housing, the period of notice is insufficient for finding substitute accommodation. We further point out that the regulation, by its 90-day limit, now recognizes that a three-month period may be necessary for finding replacement housing. Nevertheless, the Department's "opportunity to plan" interpretation would render disqualifying a significantly shorter notice period. Thus, for example, a family displaced by fire is eligible for emergency assistance for 90 days. A family displaced by a 30-day notice of eviction is ineligible for any emergency assistance even though replacement housing may take 90 days to find. The anomaly is self-evident.
In short, we are satisfied that an "opportunity to plan in advance" as used by the regulation contemplates more than mere knowledge of the imminent situation requiring remedy. We regard the phrase, rather, as implying not only the obligation but also the capacity to avert the emergency before it occurs. See Diegidio v. Division of Public Welfare, et al., 214 N.J. Super. 531 (App.Div. 1986). We therefore conclude that the Department's restrictive interpretation, at least insofar as it disqualifies evicted families, is inconsistent with the purpose of the regulation and, indeed, with the purpose of the federal enabling legislation. We accordingly hold that in assessing each individual claim for emergency assistance under the regulation, the County personnel administering AFDC must ascertain whether the applicant, based on her own circumstances, in fact had the realistic capacity to plan for substitute housing within the notice period. If not, the applicant must be found eligible. We further hold that in view of the mandate of Metromedia, Inc. v. Director, *453 Div. of Taxation, 97 N.J. 313 (1984), any further interpretation of the regulation which the Department undertakes with the intention that it bind the administration of AFDC emergency assistance throughout the state can only be effected by an exercise of the formal rule-making power.
With respect to the challenge to the time limitation, we appreciate the force of the Department's contention that the Public Advocate is inappropriately attempting by this litigation to convert the emergency assistance component of AFDC into a long-term solution for a chronic problem. We agree that emergency assistance, particularly in view of the unsatisfactory motel-room accommodation it typically makes available to displaced families as a temporary interim solution, was never intended as a long-term response to homelessness. Clearly, the concept of emergency assistance was to provide a bridge over the abyss of temporary homelessness. On the other hand, we cannot conceive of legislative approval of a bridge which does not span the abyss but simply comes to an end in the middle of the void.
Our thesis is this. The present maximum time limit of the emergency assistance regulation ought to provide an adequate period for the location of substitute permanent housing for displaced families. The Atlantic City experience as attested to by Helen Seitz, to whose affidavit we have referred at length, constitutes impressive evidence of the success which can be achieved in quickly relocating displaced families when intensive efforts are made by different levels of government acting cooperatively and with a modicum of financing. It also appears that the Governor's long-term and profound commitment to resolving the homelessness problem and the concomitant efforts of the Legislature and those state departments and administrative agencies whose responsibilities require them to deal with the problems of displaced families, may be beginning to produce viable alternatives for assisting chronically displaced families.
*454 Nevertheless, there are families, those involved in this case and those whose plights are described by the amicus curiae, for example, for whom the time period appears to be inadequate. The public policy of this state nevertheless demands that they continue to be reasonably sheltered. Thus, if the extension of emergency assistance beyond the time limit were in fact the only resource available to prevent the homelessness of displaced families, we would be required directly to confront the question of the compatibility of the time limitation with the express public policy of this state. We do not know, however, if that is necessarily the case in view of recent programs, plans, and legislation in place and proposed.[6] Nor do we know how many families now denied emergency assistance because of the fault standard would be able to relocate within 90 days if they had emergency assistance shelter while trying to find replacement housing. Nor do we know the extent to which homelessness is an increasing phenomenon and, if so, the rate of its increase in recent months. Nor do we know if, as respondents assert, the continued homelessness of some displaced families is attributable to their refusal to relocate out of their "home" communities.
*455 We conclude therefore that we cannot definitively assess the validity of the Department's 90-day limitation or indeed the validity of any other limitation in terms of the legislative policy and purpose of N.J.S.A. 44:10-1, et seq., until the Department itself, by way of a comprehensive public hearing, has had the opportunity to reassess that limitation in terms of the scope and nature of the homelessness problem, the existence of all other resources for homeless families and the manner in which and by whom these resources are coordinated and actually made available, the financial impact of extending emergency assistance beyond 90 days, and a consideration of whether or not there are any other appropriate and reasonable conditions or limitations which could or should be imposed in determining eligibility or continued eligibility for assistance. We are, moreover, persuaded that the Department of Community Affairs, all other agencies of all levels of government whose responsibilities involve the homeless, and private organizations dealing with these problems must be asked to participate in such a hearing. See, e.g., Mortg. Bankers Ass'n v. N.J. Real Estate Com'n, 102 N.J. 176, 193 (1986).
As the Supreme Court held in Texter v. Human Services Dep't, 88 N.J. 376, 385-386 (1982), in requiring the Department to conduct a hearing to consider amendment of its regulation fixing income eligibility of medical assistance to the aged:
Administrative agencies possess the ability to be flexible and responsive to changing conditions. * * * This flexibility includes the ability to select those procedures most appropriate to enable the agency to implement legislative policy. * * * Therefore, agencies sometimes develop hybrid proceedings possessing characteristics of both adjudication and rulemaking. * * * In fact, courts and commentators have encouraged hybrid agency proceedings as a way of producing more reasoned agency decisions, especially in complex and controversial policy areas. * * *
The choice of proceedings, however, rests within the discretion of the agency. Courts normally defer to that choice so long as the selection is responsive to the purpose and function of the agency. * * * Here, the Commissioner initially established the income eligibility requirement by regulation. Plaintiffs' challenge is typical of a request for rulemaking in that it involves investigative fact-finding, general background information and evaluation of the impact of the standard for income eligibility. In addition, the APA [Administrative *456 Procedure Act] now requires agencies to assess the socio-economic impact of proposed regulations. * * * That language encompasses the assessment of the impact of inflation on the MAA [Medical Assistance for the Aged] income eligibility standard. Consequently, a rulemaking procedure is more appropriate than case-by-case adjudication of plaintiffs' claims. [citations omitted]
These observations are of singular appositeness here. We are also persuaded, in view of what we have already said respecting governmental recognition of its obligation to homeless families, that we must also follow the lead of the Supreme Court in Texter by directing, until some form of aid other than the presently limited emergency assistance is available, that "termination of benefits be stayed pending the completion of the administrative proceedings." 88 N.J. at 390.
We have taken the course of action of requiring the Department to reconsider these matters in the first instance because it is the Department to whom the Legislature has committed the primary responsibility for devising and implementing appropriate programs within the statutorily expressed policy. The Department is entitled to our deference in the manner in which it undertakes to fulfill its statutory mission, and it is not our intention to usurp or infringe upon its function. We recognize, however, that the inordinately difficult and pressing societal problem of homelessness is one which must engage all levels of government whose involvement is legitimately invoked, and our primary concern, therefore, is that the Department predicate its regulatory action on as full and pertinent a factual basis as can be made available. See Dougherty v. Human Services Dep't, 91 N.J. 1, 10-12 (1982).
In summary, we hold that the administrative interpretation of the standard of "opportunity to plan" as set forth in Program Instruction No. 85-9-1 is invalid as being overbroad in contravention of legislative policy. We remand to the Department of Human Services for a rule-making hearing both on the effect and consequence of the 90-day limit of N.J.A.C. 10:82-5.10(c) and on any more restrictive fault standard the Department may propose. Enforcement of the challenged limitations of the *457 regulation is stayed in the interim. We do not retain jurisdiction.
BAIME, J.A.D. (concurring).
I file this separate opinion merely to emphasize the limited contours of our holding. We cannot and do not concern ourselves with the wisdom or policy of the administrative actions challenged here. Nor do we seek to impose whatever views we might privately harbor as to what the law should be. Such questions do not fall within the judicial province. See Spring Motors Distributors, Inc. v. Ford Motor Co., 98 N.J. 555, 577 (1985); Town Tobacconist v. Kimmelman, 94 N.J. 85, 93 (1983); In re Sports Complex Hackensack Meadowlands, 62 N.J. 248, 253 (1973), cert. den. 414 U.S. 989, 94 S.Ct. 291, 38 L.Ed.2d 228 (1973).
We are also not unmindful of the deference we are rightfully obliged to accord administrative agencies in the performance of their delegated duties. Where the Legislature has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy, the relation or nexus between the remedy and the goal sought to be accomplished is peculiarly a matter for administrative competence. In re Marvin Gastman, 147 N.J. Super. 101, 110 (App.Div. 1977). It is a basic tenet of judicial review that the courts are not free to substitute their judgment for that of the administrative agency charged with the responsibility of executing a policy enunciated by the Legislature. See Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 70-71 (1985); Bergen Pines Hosp. v. Dept. of Human Services, 96 N.J. 456, 477 (1984); Dougherty v. Human Services Dep't, 91 N.J. 1, 12 (1982); New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561 (1978).
These principles have particular efficacy where, as here, we deal with an issue involving increasing social demands for limited public resources. We hold no roving commission to determine how public moneys are to be expended. Nor do we *458 as judges have a monopoly on justice. "We share it with many, and not just the Legislature and the Executive." Dougherty v. Human Services Dep't, supra, 91 N.J. at 10. Rather, "[w]e share it also with administrators whose task is often a lot more difficult than ours." Ibid.
The question presented here can be stated with disarming ease. We are asked to determine whether the regulation promulgated by the Department of Human Services as construed and applied by the Division of Public Welfare subverts the public policy objectives set forth in N.J.S.A. 44:10-1(a) and in a plethora of other official pronouncements. Able counsel have provided us with thorough and copious briefs and we also have the benefit of a voluminous record concerning the issue. We have nevertheless decided to return this issue to the administrative agency for a full hearing to insure that the legislative mandate will not be thwarted.
This course seems eminently reasonable. After all, the Department of Human Services is best situated to determine whether its own regulation advances or subverts the public policy objectives sought to be achieved. To that extent, the result we reach is simple enough. It merely places the power to find the facts and to lay down the rules in the administrative agency charged with the responsibility of achieving the end result. Moreover, our decision is not without precedent. Suffice it to say, our Supreme Court has often had occasion to remand administrative action for further agency proceedings in the interests of justice. See, e.g., Mortg. Bankers Ass'n v. N.J. Real Estate Com'n, 102 N.J. 176, 179 (1986); Dougherty v. Human Services Dep't, supra, 91 N.J. at 10; Texter v. Human Services Dep't, 88 N.J. 376, 383 (1982).
The process we envision borrows rudimentary principles from the business world. It has been said in another context that "[t]he first rule of good management must be that management shall manage." State v. Funicello, 60 N.J. 60, 69 (1972) (Weintraub, C.J., concurring), cert. den. sub nom. New Jersey *459 v. Presha, 408 U.S. 942, 92 S.Ct. 2849, 33 L.Ed.2d 766 (1972). Stated somewhat differently, "[a] work force cannot be effective if it cannot know how it is to function." Ibid. When questions arise in the business world concerning how best to accomplish an articulated objective there is generally an established line of communication between supervisor and worker whereby such information, so obviously needed for intelligent management, can be obtained. Such guidance is imperative to insure efficient administration.
The problem is far more complex in the context of our tripartite system of government. The separation of powers doctrine is a fundamental part of our organic law. It has been hailed as the great "contribution of Anglo-American lawyers to the prevention of absolutism and the preservation of the rights of the individual against the state." Mulhearn v. Federal Shipbuilding and Dry Dock Co., 2 N.J. 356, 364 (1949). See also Heckel, "Constitutional Law," 4 Rutgers L.Rev. 42, 43 (1949). The doctrine "expresses a profound belief that the concentration of governmental power increases the potential for oppression, and that fragmentation ... helps ensure its temperate use." General Assembly of State of New Jersey v. Byrne, 90 N.J. 376, 381 (1982). It bears emphasis that distribution of governmental authority was not designed to promote efficiency. State v. Gregorio, 186 N.J. Super. 138, 145 (Law Div. 1982). Its very purpose was to create friction, thereby saving the people from autocracy. Myers v. United States, 272 U.S. 52, 292-95, 47 S.Ct. 21, 67-68, 71 L.Ed. 160, 242-243 (1926) (Brandeis, J., dissenting).
It is far different to suggest, however, that the separation of powers doctrine is to be construed as creating "three mutually exclusive watertight compartments." Massett Building Co. v. Bennett 4 N.J. 53, 57 (1950). Such a complete "hermetic sealing off of the three branches" would render government unworkable. Buckley v. Valeo, 424 U.S. 1, 121, 96 S.Ct. 612, 683, 46 L.Ed.2d 659, 746 (1976). See also Gilbert v. Gladden, 87 N.J. 275, 281 n. 3 (1981); Knight v. Margate, 86 N.J. 374, *460 387-388 (1981); State v. Leonardis, 73 N.J. 360, 370 (1977); David v. Vesta Co., 45 N.J. 301, 324 (1965). The doctrine "necessarily assumes the branches will coordinate to the end that government will fulfill its mission." Brown v. Heymann, 62 N.J. 1, 11 (1972).
This appeal presents precisely the type of cooperation and coordinated activity that is envisioned in the foregoing cases. No reasonable person currently disputes the magnitude of the problem of the homeless. As well documented in Judge Pressler's thorough opinion, the pronouncements of the Governor and the Legislature are replete with references to the mission of government to shelter the homeless. Faced with these statements, we cannot fairly say on the record presented to us, however voluminous, whether the regulation as interpreted and applied by the Division of Public Welfare realistically advances the oft-articulated public policy. Against that backdrop and mindful of the delicate allocation of powers between the three branches, the judiciary would fail in its allotted responsibility if it were merely to offer what amounts to its "best guess" as to the effect and ramifications of the regulation. Rather, we believe that an appeal to this court should be more rewarding than a trip to Delphi. State v. Funicello, supra, 60 N.J. at 82. I thus agree that the matter should be remanded to the Department of Human Services for a rule-making hearing both on the effect and consequence of the 90-day limit of N.J.A.C. 10:82-5.10(c) and on any more restrictive fault standard the Department may propose.[1]
NOTES
[1] While we recognize that the problem of homelessness affects various segments of society, we limit our consideration here to families with dependent children receiving assistance pursuant to N.J.S.A. 44:10-1, et seq., (Assistance for Dependent Children) since that is the category of homeless person addressed by this litigation. We further note that although the record in this action does not provide us with a certain count of the total homeless or of the number of homeless families in this state, the Report of the Governor's Task Force on the Homeless estimated 20,000 homeless people in October 1983 and pointed out that the City of Newark has recently estimated its homeless population at 8,500. See Report of the Governor's Task Force on the Homeless, October 1985, Preface.
[2] In his "Annual Message to the New Jersey State Legislature," delivered on January 13, 1987, Governor Kean stated that "[t]he State had to take 900 children because their mothers and fathers could not put a roof over their heads." Id. at 63.
[3] We point out that since the federal statute does not impose a fault standard on the availability of emergency assistance matching funds, a state plan which offered emergency assistance without reference to fault would be eligible for 75% reimbursement of cost.
[4] In addition to the two Governor's Task Force Reports, see "Action Plan for Children," Governor's Committee on Children Services Planning, 1985; "Children Entering Foster Care: Factors Leading to Placement (Summary Report)," Division of Youth and Family Services, Bureau of Research Evaluation & Quality Assurance, January 1985; "Report of the First Year Operation of the New Jersey Department of Community Affairs Homeless Prevention Program," Department of Community Affairs, Division of Housing and Development; "The Cost of an Adequate Living Standard in New Jersey," National Social Science and Law Project, 1980, updated in 1983.
[5] It is arguable that the regulation, by its own express terms, intended that an applicant be eligible for emergency assistance by meeting only one or the other criterion, that is, by having no control over the emergency or by having no opportunity to plan. We hesitate, however, to so construe the regulation in light of the long-standing agency interpretation that it imposes a conjunctive standard and in light of the fact that no party makes that argument. It is, of course, also arguable that the regulation intended to define emergency in terms of both prongs of the standard, control and opportunity to plan. The Department, of course, is free to clarify this matter by regulatory action.
[6] We note, for example, that in his 1987 "Annual Message to the New Jersey State Legislature," Governor Kean, after declaring that "we must do better at providing emergency housing to fill in the gaps," announced that

In addition to DCA's homeless prevention program, I am asking Human Services Commissioner Drew Altman to develop a program that will aid homeless families before they become so desperate. I believe this can be done with a minimum of new state funding by shifting money used to care for displaced children and by seeking regulatory changes to attract federal matching funds. [Id. at 63]
It was also the recommendation of the Governor that nonprofit and private groups operating shelters be given financial assistance by the Housing Demonstration Fund to assist them in code compliance. Ibid.
We further note the recent introduction of H.R. 558, a budget supplement bill for 1987, proposing the appropriation of 500 million dollars for emergency relief for the homeless. That bill has been referred to the House Committee on Banking, Finance and Urban Affairs.
[1] As noted in Judge Pressler's opinion, another panel of the Appellate Division has held that "the phrase `control or opportunity to plan in advance' embodied in N.J.A.C. 10:82-5.10(c) includes not only the obligation but also the capacity to avert a projected emergency before it occurs." Diegidio v. Division of Public Welfare, et al., 214 N.J. Super. 531, 537 (App.Div. 1986). In light of our disposition, I have no occasion to directly address that issue. I assume that the Department will consider the Division's interpretation of the phrase "control or opportunity to plan in advance" during the course of the hearing on remand.